NATIONAL CASH REGISTER CO. v. AMERICAN CASH REGISTER CO.

(Circuit Court of Appeals, Second Circuit. March 21, 1910.)

No. 187.

1. PATENTS (§ 80*)—PATENTABILITY—PRIOR PUBLIC USE OR SALE.

The purpose of the provision of Rev. St. § 4920 (U. S. Comp. St. 1901, p. 3394), making it a defense to an action for infringement of a patent that the patented invention had been in public use or on sale in this country for more than two years before the application for the patent, is to require a patentee to act promptly in securing his patent, and he cannot have the monopoly given by the patent laws unless he relies upon their protection and seeks it early.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 103; Dec. Dig. § 80.*

Priority and continuance of public use of invention as affecting patentability, see note to Eastman v. Mayor, etc., of City of New York, 69 C. C. A. 646.]

2. PATENTS (§ 78*)—PATENTABILITY—PRIOR SALE.

 A single sale of a single machine by the inventor more than two years before his application for a patent thereon, without restriction as to its use, is sufficient to invalidate the patent.

 [Ed. Note.—For other cases, see Patents, Cent. Dig. § 99; Dec. Dig. § 78.*]

3. PATENTS (§ 76*)—PATENTABILITY—PRIOR "SALE."

 The manufacture of a machine upon an order for its construction, followed by its delivery and acceptance, constitutes a "sale" within the patent statute.

 [Ed. Note.—For other cases, see Patents, Cent. Dig. § 98; Dec. Dig. § 76.*

 For other definitions, see Words and Phrases, vol. 7, pp. 6291–6306; vol. 8, p. 7793.]

4. PATENTS (§ 328*)—VALIDITY—CASH REGISTER.

 The Juengst patent, No. 499,294, for a cash register, is void because of the sale of a machine embodying the completed invention more than two years before application for the patent.

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by the National Cash Register Company against the American Cash Register Company. Decree for complainant, and defendant appeals. Reversed.

Border Bowman, P. A. Staley, and Charles W. Stapleton, for appellant.

Drury W. Cooper and J. B. Hayward, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

NOYES, Circuit Judge. This is a suit in equity to restrain the alleged infringement of letters patent No. 499,294, dated June 13, 1893, and issued to Charles A. Juengst, assignor, for an improvement in cash registers.

The defendant at the outset questions the jurisdiction of the Circuit Court, and then sets up several defenses, only the first of which we will be called upon to consider.

The jurisdictional contention is that the complainant has failed to show the commission of an act of infringement within the district. In our opinion this contention is without foundation. The proof clearly shows a sale of an infringing machine in New York City, although, in view of our disposition of the cause, we need not review it. The Circuit Court had jurisdiction.

The first defense to the merits—following the order of the defendant's brief—is that the machine of the patentee was on sale in this country earlier than two years before the patent was applied for.

The defense of constructive abandonment through prior sale first appeared in the patent act of 1836 (Act July 4, 1836, c. 357, 5 Stat. 117), which provided that a defendant might defend by showing that the patented thing "had been in public use or on sale with the consent and allowance of the patentee before his application for a patent."

This provision was modified by the patent act of 1839 (Act March 3, 1839, c. 88, 5 Stat. 353), which provided that purchases and sales prior to the application for the patent should not invalidate it except on proof "that such purchase, sale or prior use had been for more than two years prior to the application." The consolidated patent act of 1870 (Rev. St. § 4920; also, section 4886) provided that a defendant might show by way of defense that the patented device "had been in public use or on sale in this country, for more than two years before his application for a patent." And this language has not been changed by the amendments of 1897 (Act March 3, 1897, c. 391, §§ 1, 2, 29 Stat. 692 [U. S. Comp. St. 1901, p. 3394]) and 1903 (Act March 3, 1903, c. 1019, 32 Stat. 1225 [U. S. Comp. St. 1901, p. 1270]).

The purpose of these provisions was and is to compel an inventor who seeks the monopoly afforded by the patent statutes to act with promptitude. An inventor who has regard for his invention will not delay applying for protection. The laws give him ample time. If he permit the public to use that which he has invented and stand by for years while they use it, he loses the right to take it back from the public. If he chooses to sell the machine embodying his invention without the protection of a patent, it will be presumed that he does not desire it. The exclusive privileges given by the patent laws are coupled with the corresponding obligations to rely upon those laws and to seek their protection early.

Let us see whether the inventor in this case duly sought the protection of the patent laws or chose to sell the machine which he had invented without protection. The testimony here and in the interference record shows the following facts:

In 1886 the Kruse Check & Adding Machine Company was in business in New York manufacturing check machines. This company became interested in cash registers operated by key levers and made an arrangement with George Juengst & Sons, a firm engaged in the manufacture of machinists' tools at Croton Falls, N. Y., "to get them up" a cash register of that kind. The Kruse Company furnished no plans, drawings, or descriptions. Charles A. Juengst, the present patentee, was a member of the firm of George Juengst & Sons, and after one unsuccessful effort he invented and constructed a machine which was successful and which precisely embodies the invention of the patent in suit; the drawings of the patent being made from such machine. This machine was completed about July, 1886, and was retained at Croton Falls for some months, when it was accepted by the Kruse Company and was shipped to them at New York.

No arrangement was made regarding the price to be paid for the machine, but some months after it was completed and accepted Juengst & Sons presented a bill for work, labor, and materials in making both the successful and the unsuccessful machine which was duly paid by the Kruse Company. The prices charged were less than the ordinary charges made by the Juengst firm for other work because they hoped to receive further work in building the machines. There was, however, no arrangement or agreement that they should have further work, and there is no evidence to warrant a finding that there was any

joint undertaking or venture. The prices, while less than usual, afforded some profit to the firm.

No arrangement was made between the inventor and the Kruse Company with respect to the sale of the invention as distinguished from the machine or with respect to an application for a patent. No restrictions or limitations were placed upon the use or disposition of the machine. It was ordered by, made for, delivered to, and paid for by, the Kruse Company, and that seems to have been the beginning and the end of the matter between the original parties. The Kruse Company did nothing regarding the manufacture of additional machines. One reason seems to have been the fear that the machine infringed prior patents. The machine remained in the office of the Kruse Company, and no improvements upon it or experiments with it were made or attempted.

In 1889 the Kruse Company sold its assets to the Lamson Consolidated Store Service Company, and the machine in question was embraced in the sale among the "unconsidered trifles"—to use the appropriate language of the judge of the Circuit Court. Some time after this sale, Juengst, the inventor, was induced by the Lamson Company to apply for a patent upon his invention. This seems to have been done for the purpose of forcing an interference with certain patents which had then just been granted.

Assuming that the manufacture of the machine which concededly embodied the invention of the patent in suit and its subsequent delivery and acceptance constituted a "sale" within the meaning of the patent act, it is clear that it took place more than two years before the application was filed. It is also clear that it was not made for experimental purposes. The testimony in behalf of the complainant is very strong that the machine was in perfect working order when delivered, and no one made any experiments with it. Indeed, the complainant's contentions are quite inconsistent with any claim that the machine was an experiment and its sale for experimental uses. The authorities holding that the sale of an article primarily for experimental purposes will not invalidate a patent are, therefore, inapplicable.

Again, assuming that the transaction between the inventor and the Kruse Company constituted a sale, the fact that there was only a single sale of a single machine does not save the patent. One sale before the two years' period will invalidate a patent as well as many.

In Smith & Griggs Mfg. Co. v. Sprague, 123 U. S. 249, 257, 8 Sup. Ct. 122, 126 (31 L. Ed. 141), the Supreme Court said:

"A single sale to another of such a machine as that shown to have been in use by the complainant more than two years prior to the date of his application would certainly have defeated his right to a patent."

See, also, Consolidated Fruit Jar Co. v. Wright, 94 U. S. 92, 24 L. Ed. 68; Covert v. Covert (C. C.) 106 Fed. 183; Henry v. Francestown Soap-Stone Co. (C. C.) 2 Fed. 78.

We recur, then, to the question whether there was a sale of the machine by the inventor to the Kruse Company. If the manufacture of a machine upon an order for its construction, followed by its delivery and acceptance, constitutes a "sale" within the meaning of the

patent statute, a sale is shown here. The transaction was completed by the delivery and acceptance of the machine. The title then passed. There is nothing to indicate that it was intended that the machine should belong to the Kruse Company as the work progressed. The transaction in question seems to have been a "sale" within the decision in Campbell v. Mayor, etc., of New York (C. C.) 36 Fed. 263 (compare Eastman v. New York, 134 Fed. 844, 69 C. C. A. 628), relied upon by the complainant. Judge Wheeler said:

"The statute uses the word 'sale' simply, and refers to the sale as a completed transaction, required to have been fully accomplished at least two years prior to the application, in order to defeat the patent. An order for the construction of the engine accepted would not make a sale of it. If the terms of the order were such that the construction as it progressed was for the city, and the maker merely furnished the labor and materials which became the property of the city when used, the city itself would construct the engine, and there would be no purchase of it by, or sale of it to, the city, and nothing, in the view now taken of the effect of construction, to affect the right of the inventor to a patent until there was use of the engine by the city. And if the terms were such that the engine remained all the while the property of the maker as it was being built, a passing of the title afterwards would be necessary to make a sale to the city. This would not be done by merely forwarding the engine. It would be the property of the maker when forwarded, and delivery to and acceptance by the city would be necessary to make it the property of the city."

The more serious question whether the transaction between the Juengst firm and the Kruse Company amounted to a sale of the machine grows out of the distinction in the law of sales between a contract to manufacture and a contract to sell. The latter falls within, and the former without, the statute of frauds, and the decisions both in this country and in England draw fine distinctions and are the reverse of uniform. Undoubtedly, according to the weight of authority, the contract we are considering would not be a sale within the statute of frauds. And yet we think that the application of the patent act should not be made to depend upon "the 'witty diversities' (Yelv. 33) of the law of sales." Rearick v. Pennsylvania, 203 U. S. 507, 27 Sup. Ct. 159, 51 L. Ed. 295.

As already shown, the law presumes that an inventor has abandoned his invention if he sells the article which embodies it and delays more than two years applying for a patent. If he is satisfied to let the public have the thing which he has invented without protection, he will be regarded, at the end of the statutory period, as not desiring protection. Manufacturing and delivering a machine upon an advance order indicate just as much an intention to abandon the invention as delivering it when completed upon an order then obtained. If Juengst had manufactured the machine without an order and then sold it to the Kruse Company, a "sale" within the statute would be manifest. We think it would be altogether too technical and wholly out of accord with the purpose of the patent laws to hold that the manufacture and delivery of the machine upon an order obtained in advance amounted to anything different. In our opinion the disposition by an inventor for a pecuniary consideration of the article invented amounts to a "sale" within the meaning of the patent act, whether such disposition

be made in accordance with a contract to manufacture such article or to sell it after manufacture.

For these reasons we think that the defendant has shown a sale of the machine of the patent more than two years before the patent was applied for and that it is invalid. Moreover, while placing our decision upon the ground of constructive abandonment by prior sale, we must point out that the testimony goes a long way toward showing actual abandonment. The application for the patent seems to have been an afterthought, and the following language from Smith & Davis Mfg. Co. v. Mellon, 58 Fed. 705, 708, 7 C. C. A. 439, 442, seems an appropriate conclusion to this opinion:

"In conclusion it may be said that the matter of obtaining a patent was an afterthought, and one that came too late to be of any avail to the patentee, even if there was in the construction of the bed such a display of inventive skill, and such novelty and utility, as gave right to a patent, and of that we express no opinion."

The decree of the Circuit Court is reversed, with costs, and the cause is remanded, with instructions to dismiss the bill, with costs.