## DANIEL GREEN FELT SHOE CO. v. DOLGEVILLE FELT SHOE CO.

(District Court, N. D. New York. June 11, 1913.) •

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—PROCESS OF MAKING FELT SHOES.

The Green patent, No. 894,733, for a shoe and process of making the same, which relates to felt shoes, was not anticipated, and discloses patentable invention of quite high order; also *held* valid against the defense of prior public use and infringed.

2. PATENTS (§ 77*)—INFRINGEMENT OF PROCESS PATENT—EVIDENCE.

Identity of product is some evidence of identity of the process of manufacturing.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 77.*]

3. PATENTS (§ 76*)—VALIDITY—PRIOR PUBLIC USE—"ON SALE."

The advertising of an article more than two years before application for a patent therefor does not in itself establish that the article was on sale, so as to defeat the patent, where there were no actual sales until within the two years.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92, 98; Dec. Dig. § 76.*]

4. PATENTS (§ 78*)—VALIDITY—PRIOR PUBLIC USE.

While an inventor is experimenting to complete and perfect his product, the utility of which can be determined only by use of the thing by others he may sell the things made, but he must not sell the completed and perfected invention more than two years before his application for a patent therefor.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 99, 100; Dec. Dig. § 78.*]

5. PATENTS (§ 81*)—VALIDITY—PRIOR USE—SUFFICIENCY OF EVIDENCE.

To establish prior public use or sale to defeat a patent, the evidence should be clear, satisfactory, and convincing, and mere memory of a witness after the lapse of several years as to time or the identity or similarity of articles is not sufficient.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 104; Dec. Dig. § 81.*]

In Equity. Suit by the Daniel Green Felt Shoe Company against the Dolgeville Felt Shoe Company. On final hearing. Decree for complainant.

Edmonds & Peck, of New York City (Philip C. Peck, of New York City, of counsel), for complainant.

Henry Schreiter, of New York City, for defendant.

---

RAY, District Judge. [1] The patent in suit, applied for July 1, 1907, and issued July 28, 1908, No. 894,733, for "shoe and process of making the same," has 11 claims, 10 of which are in issue here. These may be divided into three groups, of which claims 1 and 6 form the 'first group, claims 2, 3, 4, and 5, form the second group, and claims 8, 9, and 10 form the third group.

·The claims of group 1 read as follows:

"1. The process of manufacturing shoes which consists in securing or attaching an upper of highly shrinkable material to a sole of a relatively less shrinkable material, dampening or wetting the upper, placing the shoe upon a form, and permitting the upper to shrink whereby the upper is shrunk to form and the sole is stretched. * * *

"6. The process of manufacturing shoes which consists in securing an upper of highly shrinkable material to an outer sole of relatively less shrinkable material, both being wrong side out, placing a padding or filling on said outer sole, turning the shoe right side out, dampening or wetting the upper, placing the shoe upon a last, and permitting the upper to shrink whereby the upper is shrunk to form and the sole is stretched."

The claims of group 2 read as follows:

"2. The process of manufacturing shoes which consists in forming a shoe with a padded sole, dampening a part of the shoe and shrinking the same upon a hollow bottomed last, the shrinking causing the shoe to conform to the ·shape of the last and the padded part of the shoe to project upward into the hollow last.

"3. The process of manufacturing shoes which consists in securing a shrinkable upper to a padded sole, dampening the shrinkable upper, and shrinking the same upon a hollow bottomed last the shrinking causing the shrinkable upper to conform to the shape of the last and the padded part of the sole to project upward into the hollow of the last.

"4. The process of manufacturing shoes which consists in securing a shrinkable upper to an outer sole, inserting a filling or padding in said sole, dampening the shrinkable upper, and shrinking the same upon a hollow bottomed last the shrinking causing the shrinkable upper to conform to the shape of the last and the padded part of the sole to project upward into the hollow of the last.

"5. The process of manufacturing shoes which consists in securing a shrinkable upper to an outer sole, inserting a filling or padding in said sole, securing an inner sole over said padding, dampening the upper, and shrinking the same upon a hollow bottomed last the shrinking causing the shrinkable upper to conform to the shape of the last and the padded part of the sole to project upward into the hollow of the last."

The claims of group 3 read as follows:

"8. The process of manufacturing shoes which consists in securing a shrinkable upper to an outer sole, both being wrong side out, placing a pad on said outer sole, securing an inner sole over said pad, turning the shoe right side out, and shrinking the same upon a hollow bottomed last thereby causing the upper to conform to the shape of the last and the soft filling and inner sole to project upward into the hollow of the last.

"9. The process of manufacturing shoes which consists in securing a shrinkable upper to an outer sole, both being wrong side out, inserting a heel pad in a heel seat, placing a pad on the sole, securing an inner sole over said pad, turning the shoe right side out, and shrinking the same upon a hollow bottomed last thereby causing the upper to conform to the shape of the last and the soft filling and inner sole to project upward into the hollow of the last.

"10. The process of manufacturing shoes which consists in attaching a welt to the heel part of an outer sole, thus forming a heel seat, attaching said

sole and said welt to a shrinkable upper, both being wrong side out, placing a heel pad in said heel seat, placing a pad over said outer sole, turning the shoe right side out, and shrinking the same upon a hollow bottomed last thereby causing the upper to conform to the shape of the last and the soft filling and inner sole to project upward into the hollow of the last."

Claim 11 is for the product. The others are for the process.

The elements or steps of claim 1 are (1) attaching an upper of highly shrinkable material to a sole of a relatively less shrinkable material; (2) dampening or wetting the upper; (3) placing the shoe upon a form and permitting the upper to shrink; (4) whereby the upper is shrunk to form and the sole is stretched.

Claim 6 (1) secures the upper to "an outer sole," both being wrong side out; (2) a padding or filling is placed on said outer sole; (3) the shoe is turned right side out; (4) dampen or wet the upper; (5) place the shoe upon a last and permit the upper to shrink, whereby (6) the upper is shrunk to form and the sole is stretched.

## Group 2.

The elements or steps of claim 2 are (1) forming a shoe with a padded sole; (2) dampening a part of the shoe and shrinking the same upon a hollow bottomed last; (3) the shrinking causing the shoe to conform to the shape of the last; and (4) the shrinking causing the padded part of the sole to project upward into the hollow last.

Claim 3 specifies a shrinkable upper, a padded sole, and provides for wetting the shrinkable upper and shrinking same on a hollow bottomed last, whereby the shrinkable upper conforms to the shape of the last and the padded part of the sole is made to project upward into the hollow part of the last.

Claim 4 is substantially the same as 3, except it secures a shrinkable upper to "an outer sole."

Claim 5 has a shrinkable upper secured to an outer sole, whereupon a filling or padding is inserted in the sole and an inner sole is placed over the padding. The upper is then dampened and the whole shrunk upon a hollow bottomed last, and the padded part is made to project into the hollow part of the last.

## Group 3.

Claim 8 secures a shrinkable upper to an outer sole, both being wrong side out, places a pad on the outer sole, secures an inner sole over the pad, turns the shoe right side out, when the whole is shrunk upon a hollow bottomed last, the same results as before following.

Claim 9 adds a heel to claim 8. Claim 10 calls for the following process: (1) Attach a welt to the heel part of an outer sole, forming a heel seat; (2) attach said sole and welt to a shrinkable upper, both wrong side out; (3) place a heel pad in said heel seat; (4) place a pad over the outer sole; (5) turn the shoe right side out; (6) shrink the same on a hollow bottomed last, obtaining the results above mentioned.

Claim 11 for the product calls for two things: (1) A shoe comprising a shrunk upper of highly shrinkable material; and (2) a stretched sole of relatively less shrinkable material.

The defendant denies the validity of the patent in suit, and also denies infringement. It alleges noninvention, anticipation, prior use, and abandonment. Prior use and sale by the complainant more than two years before the date of the filing of Green's application is strongly urged. The defendant has also introduced some 26 letters patent claimed to show anticipation.

The defendant admits making and selling slippers like Complainant's Exhibit No. 4

### Patentable Invention.

The specifications state:

"This invention relates to an improvement in felt shoes and more particularly to that class of shoe which is provided with a comparatively thin outer sole and with a cushioned insole, and the object of my invention is to provide a shoe of this character which may be molded to perfect shape and which will at the same time provide a soft or cushioned insole which will make the shoe exceedingly comfortable in wear.

"My object is preferably accomplished by forming the shoe wrong side out and after it is turned placing it in a thoroughly wet condition on a hollow bottomed last and causing the felt upper to shrink in drying thus giving it an absolutely perfect shape and at the same time compelling the soft insole to project upward, and forming a soft cushion for the foot.

"My invention therefore consists in a shoe having the characteristics just set forth and in the method of making the shoe, the invention being hereinafter more particularly described and then definitely set forth by claims at the end hereof."

Assuming no prior art, I think invention is clearly shown. It was not common knowledge, and would not, I think, have occurred to the ordinary shoemaker skilled in the art that he might make a felt shoe of this perfect shape in the manner described. It required thought, study, and experimentation, and there was involved, I think, mental conception of quite a high order. The process may be described as follows: (1) The sole is cut and molded with a heel seat which seat may or may not be integral with the sole. (2) In case the heel seat is not integral with the sole a crescent shaped welt is cut and stitched to the heel proper. (3) The upper is, of course, cut out in proper form. (4) A thin felt filler is attached to the inner surface of the sole and heel. (5) The sole and heel seat are now stitched to the upper. (6) The heel seat is then pressed downward so the heel seat will project into the shoe and so forming an aperture to receive wadding which is to form the spring heel. (7) Preferably this wadding is of felt cemented in place. (8) There is placed over the entire exposed portion of this filler a carded wool pad, and then (9) a felt inside is stitched to the edge of the upper so as to cover the pad and heel. The inside is substantially flat at this stage as the heel has been pressed downwardly. (10) This shoe thus formed wrong side out is now turned right side out. (11) The upper alone is now thoroughly wet or dampened. (12) The last with hollow bottom or form is now inserted, and the shoe allowed to dry. (13) In the process of drying the upper shrinks to the last and is shaped. It also draws, as it shrinks, on the sole and stretches it taut and flat, and this, of course, forces the wool pad up into the hollow part of the last forming a soft and easy cushion for the foot.

## File Wrapper.

The file wrapper of the patent in suit shows that the application was carefully considered, that some changes were made, and that some of the claims were to some extent, at least, narrowed. However, claims 8, 9, and 10 (original claims 9, 10 and 11) were allowed in their original form. After some amendment claims 2, 3, 4, and 5 were allowed. In claim 2 the words now found there "forming a shoe with a padded sole" and the words "padded part" were inserted by amendment and the word "inner" before "sole to project" was stricken out. Claim 1 was twice rewritten. In its original form it read:

"The process of manufacturing shoes which consists in dampening or wetting the upper of a complete shoe and in shrinking the same by drying it, whereby the upper is properly molded or formed."

It was rejected as not supporting the whereby clause, and because it was obvious that mere shrinking is insufficient to properly form or mold the shoe, a form of some kind being necessary, and it was rejected also on patent to Hawley, No. 258,916, of June 6, 1882. That patent is for an apparatus for lasting and treeing wool felt, among other things, into the form of a boot with or without leg of course. It says that "lasting and felting" consists in first softening and preparing the felted fabric to yield and take shape by steaming it, and, when so prepared, by forcing into it a block of wood of one or more pieces which will give the proper dimensions and form to the foot, and then by forcing into it another block or blocks which will give the proper form and dimensions to the leg. The felt is then thoroughly dried with the last and tree in it, and the boot will permanently retain the dimensions and form so given it. In claim 1 of the patent in suit we have more than this for the upper must be much more shrinkable than the sole, the upper only dampened, and the upper shrunk by drying on such a shaped form or last that the sole is stretched when the upper is shrunk, and the wool pad forced up so as to form the cushion for the foot.

## Prior Art.

The examiner also cited Larrabee, No. 411,454, of September 24, 1889, and Waite, No. 250,114, of November 29, 1881, and Wiley, No. 540,527, of June 4, 1895, when rejecting other of the original claims. I do not find Larrabee, No. 411,454, in the record. Waite No. 250,114 is for a "removable lining for boots and shoes." This patent covered a sort of felt slipper made on a last by placing the upper thereon in a moist or wet condition, drawing it tight, and fastening the edges to the under edges or sole of the last. A sole of felt, also wet, was then applied to the sole, and sewed to the upper. When dry, a slit was cut in the upper to allow of removing the last, and this slit permitted the insertion and withdrawal of the foot of the wearer. These patents show that it was old to form a felt boot or shoe on a last by wetting and allowing same to dry on the form. Wiley, No. 540,527, is a patent for "sole for slippers or light shoes." I find nothing in this patent at all material to this controversy except it shows a sole of leather or similar suitable flexible material permitting the outer edges to be up-

turned, then a stiffening sole such as paper board, and then an insole of lamb's wool with the edge reinforced by tape, and then the upper usually of some woven or knit fabric. It shows simply that an insole of lamb's wool was old.

The defendant claims that the process of the patent in suit is very similar to that described in the patent to Adam Reed for shoe, No. 544,748, of August 20, 1895. There is more or less similarity of process in all shoemaking, but that of Reed is widely different from the patent in suit. It suggests nothing unless it be the "soft felt of lamb's wool."

So far as I can find in this record, Green did something that had not been done before, and in a new and novel way. It is immaterial that he used things not new in this art. The question is, Has he used them in a new and a novel way so as to build a shoe by a new process producing some useful thing thereby? I think this must be answered in the affirmative. Hollow bottomed lasts had been used before in this art unquestionably, but not for the purpose Green used them, and not to attain the result he attained. By first combining his upper and his thin leather outer sole and his padded insole attached thereto, and using the material he does, and then turning and inserting the last, wetting the upper and then drying it on this hollow bottomed last, he not only gives perfect form to the upper, but stretches the outer sole out flat, making an easy and desirable tread, but he at the same time forces the padded insole up into the hollow of the last, and gives proper and desirable shape to it. I cannot find that hollow bottomed lasts had been used in the felt shoe industry prior to Green in any event for this purpose.

Dunham in his reissue patent, No. 1,363, of December 16, 1862, mentions a concave bottomed last, but his object in using it was to facilitate sewing as is clearly expressed and stated, viz.:

"The nature of my invention or improvements consists as follows, viz.: Of a combination of a curved hook-needle and the last as made with a concave bottom, in order that the needle may work through the upper leather and the sole at or near their adjacent edges; * * * also, in the combination of the curved and hooked needle with the last constructed with a concave bottom and with a chamfer, or with equivalents, so as to form a ridge on the last, as hereinafter described. * * * The said sole and upper leather are to be arranged on a last J whose bottom is to be concave instead of being made convex, as in ordinary lasts, this form being necessary in order to enable the needle and awl to operate in a proper manner with respect to the edge of the sole and the upper. This concavity of the bottom extends longitudinally, as well as transversely, through the last. There is also another peculiarity in the construction of the said last—that is to say, the last entirely around the edge of the sole is chamfered or formed with a chamfer, as seen at c³ in Fig. 3, and also in Fig. 10, which is a view of the sole of the last. This chamfer with the concavity of the bottom, forms a ridge which imparts to the leather sole along or near its edge a bend which is highly favorable for the reception of the needle and the awl. This formation of the last with a hollow or concavity, and with the chamfer outside thereof, so as to form the ridge within or inside of the outer boundary of the last-bottom, is a feature of importance to the correct operation of the needle and awl."

The Mills patent, No. 123,835, and the Day patent, No. 291,991, show hollow bottomed lasts, and Day claims such a last, but these

were not made or used for the purpose Green uses his in his process, to wit, stretching the sole of the shoe. flat, and pressing the wool and insole up into the concavity to form a cushion.   Mills says:

"In the third place, it consists in the construction of the sole of the last of concave form throughout its whole area inside of the above-described projection, for the purpose of taking up the excess of the length of the sole over that of the last, and to bring the middle portion of the sole out of the way of the awl and needle in stitching, and also to facilitate the turning of the shoe in its removal from the last. * * * I concave the face *g* of the sole of the last over the whole surface inside of the projection *f*, whereby the excess of leather in the length of the sole *F* over that of the last is taken up, and the middle portion of the sole is brought down out of the way of the awl and needle. This form of the face *g*, by which the sole is brought inward, in conjunction with the clasping-lip *d* of the band *D*, allows the shoe to be turned, in its removal from the last, after the withdrawal of the block *A'* from the shoe, the lower end this part *A* then acting as a stripper, and the lip *d* holding the shoe in position thereon in advance of the turning, and thus preventing the kinking of the upper, which often occurs in the old mode of turning the shoe after it is taken from the last."

Day says:

"The depth of the recess *E* in the bottom surface of the shank is greater than in the ball and toe portions, but in all portions it inclines or bevels from the inner edge, *g*, of the rib *D*, toward the central portion of the bottom surface. (See Fig. 4 more particularly.) This recessing of the bottom surface of the last for the whole width and length, and of an increased depth in the shank, the better disposes of the turned-back channeling lip or flap *F* of the channeled inner sole *G*, in using the last for lasting a boot or shoe having an inner sole channeled, and consequently the metal rib *D*, of the last can be the better seated upon and against the channel of the inner sole, which by turning back the lip or flap thereof is uncovered for such purpose."

The mode of making shoes described in these patents and the form of the last in most respects and of the concave bottom, and especially the use made of it, were different from the patent in suit. It is not a broad invention, but still a conception beyond ordinary skill is disclosed, and moreover the evidence discloses great popularity and marked commercial success. I think it was new and novel to make this shoe complete before lasting and putting in form, and then turning right side out, and completing the form and shape by wetting and allowing same to dry on the last, whereby the upper was put in permanent form, the sole stretched and put in proper shape, and the wool cushioned insole brought up into suitable and proper position. There is also novelty in stretching the sole in the way it is done. It is uncontradicted that this improved on the slipper made on the straight bottomed last and made an easier and a more popular shoe as well as a great commercial success.

### Does Defendant Infringe?

[2] Identity of product is some evidence of identity of the process of manufacturing. The witness Ortlieb, a former employé of defendant, describes the process employed by the defendant company. He says:

"Q.9. Were you familiar with such felt shoes as are shown in Complainant's Exhibits Nos. 4 and 5, which I now show you? A. Yes.

"Q.10. While you were with the Dolgeville Company, did you know how such shoes were made by that company such as are shown in these two Exhibits Nos. 4 and 5? A. Yes.

"Q.11. I hand you Complainant's Exhibit No. 5, the cut up slipper, and will ask you to describe the various steps used by the Dolgeville Company in the construction of such slipper? A. The brown felt upper was cut and seamed together behind, and a brown piece of felt was seamed up to the upper, and a black felt sole and leather sole were cemented together, and the leather sole and felt sole were sewed on to the upper, and then there is a white spring heel cemented on to the upper, and then there is a white padding laid on the black felt sole of the shoe, and then there is a brown sock lining with a label on it sewed on by hand on the shoe; then the shoe was wet and turned right side out and the hollow bottom last put in; then the white padding was placed to the hollow bottom last, the sole was stretched to the shape of the last, the upper would be shrunk to the shape of the last; then, after shoe dried eight or ten hours, we pulled them off the last and then ready for market.

"Q.12. When was the felt shoe shown in Exhibit 5 turned from the wrong side out to the right side out position? A. After the shoe was all sewed together and the padding all in and sock lining.

"Q.13. Will you tell me again just how the spring heel pad was inserted in the slipper by the Dolgeville Company such as is shown in this exhibit? A. The white spring heel is cemented in.

"Q.14. Cemented into what? A. It is placed in the pocket in the welt.

"Q.15. And cemented into what? A. Into the shoe.

"Q.16. Into what part of the shoe is it cemented into? A. Back part.

"Q.17. When did the Dolgeville Felt Shoe Company make shoes or slippers such as you have described to me? A. About three years ago.

"Q.18. And did they continue to make such shoes up to the time you left their employment? A. Yes."

The evidence with the shoe of defendant itself, is quite persuasive and convincing evidence of infringement.

### Anticipation.

I find no substantial evidence of anticipation. I have carefully read all the patents in evidence and all the evidence bearing thereon. The witness Freygang did not seem to understand the prior art for in some cases he expressly contradicted the patents themselves.

### Prior Use and Sale.

[3] The patent in suit was applied for July 1, 1907, and going back two years to July 1, 1905, we have no sample or samples of this shoe made or made and sold prior to that time. There was some advertising done. This is an offer to sell, a bid for customers, but is not a sale. National Co. v. American Co., 178 Fed. 83, 101 C. C. A. 569 (C. C. A. 2d Circuit); McCreery v. Mass. Fan Co., 195 Fed. 502, 15 C. C. A. 408 (C. C. A. 1st Circuit); Norfolk & Western Ry. Co. v. Sims, 191 U. S. 441, 447, 24 Sup. Ct. 151, 48 L. Ed. 254.

It is undoubtedly true that the making of this shoe was experimented with for a considerable length of time, and that the proper process of manufacture was in an experimental stage for some time. In all probability some experimental shoes were made during this time. Probably there came a time when having made a successful shoe, as the patentee believed, he made up his mind to place them on the market for sale, and they were advertised as matter of course, and very likely

samples were shown. Many hundreds or thousands of pairs may have been actually made prior to July 1, 1905, with intent to sell, but all this would not establish prior public use or prior sale or prior public use and sale. See cases cited.

Use must be a public use, and not merely experimental. Sale must be for the purpose of parting with title to another, and title must be parted with. One well proved instance of prior public use or sale is as good as one hundred. The question here is, Has this defendant sustained the burden of proving beyond reasonable doubt prior public use and sale or either by others? Defendant's witness, Spoar, says that usually orders are taken say in January or February for shipment say in September or October. It is not strange, then, that Green was advertising this slipper in February and March for actual sale and delivery after July 1, 1905.

The defendant claims that more than two years prior to the application by Green for the patent in suit both Green, or the company, and defendant, or its predecessor, were engaged in making and selling this slipper or shoe made substantially in accordance with the process of the patent, and that, in fact, complainant's patent was obtained to destroy or prevent or limit competition in business beween the two, and, of course, shut out others from competition.

As early as December, 1904, an advertisement was prepared for or authorized by the Daniel Green Felt Company and inserted in the February, 1905, number of Harper's Monthly Magazine, the February, 1905, number of McClure's Magazine, the March number, 1905, of Century Magazine, and March, 1905, number of McClure's Magazine. It reads as follows:

COMFY SLIPPER,    Lightest, Easiest,    Women's $1.00
                 Cosiest Made,          Men's — $1.25
                                                Delivered.

Illustration      Made of pure wool felt, kid soles
No. 457.            with one inch of carded wool
                    between felt inner sole and
                    felt and kid outer soles,              Illustration
                    making a perfect cushion tread-
                    ideal for the bedroom. Weight
                    2 ounces.
                  Colors: Navy, Blue, Drab,
                    Brown and Red.
          Send for CATALOGUE No. 25, showing many new styles.
      DANIEL GREEN FELT SHOE CO., 119 West 23d St., New York.

It contains a picture of a slipper with sole of different material from the upper, and an illustration of the construction showing "upper felt," "felt insole," "carded wool" "felt," and "leather," proceeding from top to bottom. This shows complainant's construction to an extent beyond all manner of doubt, but not the process. Mr. James A. Green, complainant's superintendent, formerly assistant superintendent, from 1902, describes the process of making the "Comfy" slipper or shoe, for which a trade-mark "Comfy" was obtained, as follows:

"Q.11. Will you kindly illustrate by specimen samples the various steps used by the Daniel Green Felt Shoe Company in the manufacture of slippers like Complainant's Exhibit No. 6, throughout the process of construction? A.

205 F.—48

I will. The 'Comfy' slipper is made by the Daniel Green Felt Shoe Company under letters patent 894,733 and is as follows: The felt upper is first cut and then seamed up the back, after which a felt welt or wedge is stitched around the heel seat or back part of the slipper, as shown by this exhibit. Next, a felt sole and leather sole are cemented together and then sewed onto the felt wedge and upper, as shown in this exhibit, the upper and the sole being wrong side out; next, a felt spring heel is cemented to the felt sole at the heel of the slipper as shown in this exhibit; next a felt or carded wool padding is placed upon the felt sole and covered by a felt insole or sock lining; this felt or sock lining is attached to the upper by stitches around the edge, as shown in this exhibit; the several parts of the shoe are now assembled and properly attached to each other; the upper is then wetted, and the slipper is turned right side out and a hollow bottom last inserted; the slipper is then allowed to stand for eight hours or more to allow the felt to dry out and shrink to the shape of the last, which process causes the leather sole to slightly stretch, making the bottom of the shoe flat and causing the felt padding and inner sole or sock lining to be forced up into the hollow bottom of the last; the shoe now being thoroughly dry the hollow bottom last is withdrawn and the 'Comfy' shoe is complete and ready for the market as shown in Exhibit No. 6."

He also testifies:

"Q.12. When did the Daniel Green Felt Shoe Company begin the manufacture and sale of slippers like that shown in Complainant's Exhibit No. 6? A. In the year 1907.

"Q.13. What time in the year 1907 as near as you can remember? A. As near as I can remember it was in the summer about the time we applied for a patent."

And again:

"Q.4. When did the Daniel Green Felt Shoe Company begin the manufacture and sale of the padded sole slippers made according to the Green patent here in suit, having the spring heel covered with a leather welt, and for how long was this continued? A. We commenced making padded sole slippers with a leather welt in 1906, and continued making them this way through the year 1907."

This testimony is either true or false, as the witness knew the fact. The witness William R. Green, testified as follows as to the defects following the use of the nonhollowed last, or "straight bottom" last, and what was done, and when to remedy the defects which was accomplished by substituting a hollow bottom last made for the purpose:

"Q.11. What do you mean by a 'straight bottom' on such last? A. I mean a last that is not hollowed out on the bottom.

"Q.12. By using such 'straight bottom' last in lasting the padded sole slippers before you got the hollow bottom last, what results were obtained where such straight bottom lasts were used? A. By placing the wool padding which we used on a straight bottom last, the padding, by forcing the last in the slipper, bulged outwardly, giving the slipper a sort of ridge shape in the center, and rounding appearance.

"Q.13. What results did you find came from the use of such slippers where the padding bulged outwardly forming a ridge along the sole? A. I found that by walking on the wool padding the heat of the foot and the action in walking felted the padding together, and that the padding, instead of being an inch or more thick when put in the slipper, was felted down to about a quarter of an inch thick. This caused the soft leather outer sole to wrinkle and be flabby.

"Q.14. How did you come to devise the use of the hollow bottom last in place of the straight bottom last in the manufacture of these padded sole slippers? A. I found that by testing these slippers that the slipper with the padding against the straight bottom last was forced out, and I thought that

by hollowing the bottom of the last that the padding would be reversed; that is, forced on the inside of the slipper forming a cushion for the foot, and making a slipper of much neater appearance.

"Q.15. What did you do then to remedy the defect of the bulging padding on the sole and the wrinkling leather sole caused by the use of the straight bottom last after you had made these tests? A. On one of my visits to the factory I told Mr. James Green to hollow out one of our lasts and make a trial slipper.

"Q.16. Was this done in accordance with your suggestion? A. He got one of our lasts, and had it hollowed out by hand.

"Q.17. Were such trial slippers made on such last? A. They were.

"Q.18. What was the result of these trial slippers made by the use of the hollow bottom lasts? A. The padding was forced up into the hollow of the last by the stretching of the sole, and a slightly elevated cushion was formed on the inside of the slipper.

"Q.19. How was the padding forced up into the interior of the slipper by the stretching of the sole as you have testified to in your last answer? A. The padding was forced up into the hollow of the last by wetting the upper and the shrinking of the upper stretched the sole making it flat and creating an even surface.

"Q.20. State as near as you can your recollection as to time you made these suggestions of hollowing out the lasts to Mr. James Green, and the trial shoes or slippers that were made as the result of your instructions? A. It was in the spring of 1905.

"Q.21. Please state whether or not the hollow bottom lasts did away with the wrinkling which you have spoken of in the leather sole, and due partially to the felting of the padding? A. It did."

As to the advertisement referred to, he says:

"Q.25. How did you come to advertise padded sole slippers February, March, and April, 1905? A. I was experimenting with them and was anxious to get them tested; and thought that, it being a lighter felt slipper than we had made before, they might be used in the spring."

[4] After a careful reading and study of the testimony given in behalf and on the part of the defendant tending to show that these slippers in controversy were made and put in public use or put on public sale more than two years prior to the application for the patent, I am not at all satisfied that such was the fact. As I understand, while an inventor is experimenting to complete and perfect his product the utility of which can be determined by use of the thing by others only, he may sell the things made, but he must not sell to the public or allow public use more than two years before his application for a patent of the completed and perfected invention. Smith Co. v. Sprague, 123 U. S. 249, 256, 8 Sup. Ct. 122, 31 L. Ed. 141; Eastman v. City of N. Y., 134 Fed. 844, 858, 69 C. C. A. 628; Andrews v. Hovey, 123 U. S. 267, 273, 8 Sup. Ct. 101, 31 L. Ed. 160. It would be unreasonable, I think, to hold that a person engaged in making and selling felt shoes, and all the time experimenting and improving, cannot sell the articles made while such experimentation is going on. But the moment he gets the idea and has made his invention the two years' period begins to run. Quite likely similar shoes with the ridged bottom or sole were made on the straight bottom last, but such slippers or shoes were not within this invention or patent. Unless examined with attention and care, or worn, the difference would not be noted. This patent is narrow, and it is not probable that workmen, who had no interest in the subject and whose attention was not specially called to the question at the

time can now remember the time when the shoe or slipper made according to this patent was first made and put on the market. I have several times heard witnesses testify with apparent candor and seeming honesty that they could and did remember seeing things done before a given time or event, and swear that they did happen before that event, at the same time stating they did not notice such things at the time they happened at all.

[5] Mere memory after a lapse of five or six years is frail evidence on which to defeat a patent. To establish prior public use or prior public sale the evidence should be clear, satisfactory, and convincing. Mere memory that a shoe was "like" or "similar to," etc., is not sufficient. But defendant claims to have shown by book entries, bills, etc., that these slippers made according to this patented process, and bearing this name and number given them, were on public sale more than two years prior to July 1, 1907. This is not at all clearly shown. There is too much doubt, confusion, and uncertainty. If the defendant was making and selling these slippers made according to this process more than two years prior to July 1, 1907, it would seem it ought to be able to prove the fact beyond any controversy. But I do not think the evidence given by it to prove this alleged defense raises a serious question of fact. There are some facts shown which indicate that such may be the case and thus a doubt is created, but this is not enough, and the fact is not clearly and satisfactorily proved. The burden of proving that defense is not sustained. See Walker on Patents (4th Ed.) § 76, and cases there cited. I have weighed this evidence in the light of the interest, direct and indirect, quite a number of the witnesses have in the controversy. Interest is a powerful motive to give false or colored testimony; and the greater the interest the greater the motive. It may and it may not induce a witness to give false testimony. In such a case as this, it is to be regretted that the court did not see and hear these witnesses who spoke on the subject of this prior sale. But it must take the records and exhibits as it finds them and reconcile the testimony of all consistently with the truth of all, which can be done here allowing for errors and mistakes and the frailty of human memory. I feel compelled to hold that slippers and shoes made under the process described in this patent were not made and sold by any one more than two years prior to the time the invention was actually conceived.

There will be a decree for the complainant with costs.

However, if the defendant desires to appeal and will do so within 30 days after being served with a copy of the decree, the issue of an injunction will be suspended pending determination by the Circuit Court of Appeals, if due diligence is shown in bringing same to argument, and it will keep an account open to inspection of all sales of the infringing slipper and give a bond in the sum of $5,000 to pay all costs and damages finally awarded.