CHICOPEE MANUFACTURING CORPORATION, Plaintiff,

v.

COLUMBUS FIBER MILLS CO., Inc., Defendant.

Civ. A. No. 631.

United States District Court
M. D. Georgia,
Columbus Division.

June 27, 1958.

308

Morgan, Finnegan, Durham & Pine, New York City, William D. Denson, Washington, D. C., Charles A. Harris, New Brunswick, N. J., Foley, Chappell, Kelly & Champion, Columbus, Ga., for plaintiff.

Keith, Bolger, Isner & Byrne, New York City, Wilkinson, Mawhinney & Theibault, Washington, D. C., Swift, Pease, Davidson & Chapman, Columbus, Ga., for defendant.

BOOTLE, District Judge.

By the complaint as amended, the plaintiff alleges that the defendant has infringed four patents issued to and owned by the plaintiff and seeks an accounting and judgment for profits and injunctive relief. The defendant denies the validity of all of the patents upon various grounds, and denies infringement except only as to one of the design patents. The defendant also, by way of counterclaim, prays for a declaratory judgment to the effect that all of the said patents are void and that three are not infringed.

The Court, having tried the case without a jury and having given careful consideration to the great volume of testimony adduced orally and by depositions and to the written and oral arguments of able counsel on both sides, now makes and incorporates in this memorandum opinion its findings of fact and conclusions of law.

Plaintiff and defendant are textile companies presently competing with each other and with a large number of other companies in the field of manufacturing and selling plastic fabrics for use as automobile seat covers.

Of the four patents involved, two are mechanical or product patents and two are design patents. On August 7, 1956, Letters Patent No. 2,757,437 were issued to plaintiff upon the joint application of Harold P. Faris and Bernard R. Koenig (herein called the Faris patent), and on the same day Letters Patent No. 2,757,436 were issued to plaintiff upon the application of Jonathan Ferrell Nicholl (herein called the Nicholl patent). Both the Faris patent and the Nicholl patent were applied for on March 31, 1955 and each was for an alleged invention in puffed fabrics. U. S. Letters Patent Nos. Des. 178,456 and 178,462 were also issued to plaintiff on the same date the product patents were issued, August 7, 1956. These patents will be discussed in the order above named, much of what is said as to the Faris patent being also applicable to the Nicholl patent and the two design patents being discussed jointly.

### Patentability of Faris Invention

The Faris patent is being discussed first because it has a longer history than the others. Both it and the Nicholl patent relate to woven fabrics having puffed portions. It is claimed that the puffs are both useful and ornamental, useful in that they provide space for air circulation thus imparting "breathing" qualities and coolness to the fabric, and ornamental in that they provide an attractive three-dimensional appearance. The patent contemplates a fabric made predominantly of thermoplastic material, the fabric to be puffed and made three dimensional in that certain loosely attached or "floater" threads or filaments are used on the under side of the fabric which floaters have a higher shrinkage propensity upon the application of heat than do the threads in the main body causing those floaters to shrink to a greater extent than the main body and thereby causing the main body to buckle or puff. The specifications say in part: "The thermoplastic, heat shrinkable floats, on heating, deform where they intersect the main body of the fabric, which helps to retain the puffs in their desired form. The retention of the puffs is further enhanced wherein the main body is also thermoplastic, due to the setting or hardening of the main body of the fabric on cooling", and again "the puffs are retained in the fabric body in use, due to the setting of the main body, including the puffed portions after the shrinking operations, by the formation of crimps in the floats or shrinkers where they intersect the main body and by the adhesion of the floats to the main body where they intersect said body at points."

The claims set out in the Faris patent are:

"1. A woven fabric comprising a main body consisting predominantly of interwoven thermoplastic warp and weft filaments and having sharp and accentuated puffs which are retained during use of said fabric, and

filaments heat-shrunken from thermoplastic heat-shrinkable filaments having higher shrinkage characteristics on the application of heat than the filaments forming the main body of the fabric, said heat-shrunken filaments being floated predominantly on the back of the main body of said fabric and across the puffs.

"2. A woven fabric in accordance with claim 1, wherein at least about 75% of the total lengths of said heat shrunken filaments are floated on the back of the main body of said fabric.

"3. A woven fabric in accordance with claim 1, wherein the heat-shrunken filaments intersect said main body to define the borders of said puffs.

"4. A woven fabric in accordance with claim 3, wherein short lengths of the heat-shrunken filaments are floated over the face of the main body of the fabric.

"5. A woven fabric in accordance with claim 1, wherein the main body is heat set."

Plaintiff makes no pretension to being the first to discover puffed fabrics, or even puffed fabrics containing thermoplastic threads or filaments. Moreover, the Faris patent itself says that " * * the main body of the fabric is of a well known woven structure, wherein, looking at the face of the fabric as in Fig. 3 the filler or weft threads are alternately woven under two and over one of the warp threads." In plaintiff's brief furnished to this Court, plaintiff's able counsel with commendable frankness and in order to arrive at the heart of the issue, says, "Three-dimensional fabrics and specifically puffed fabrics as such were old and well-known long before the Faris invention. The creation of puffs by shrinking treatments, including shrinking by heat, also was known. Moreover, the various types of weaves shown in the patent and exemplified in various embodiments of the patented fabrics are old and well-known."

For the validity of the Faris patent, therefore, the plaintiff relies upon a combination of old and well-known elements and says that such combination constitutes an improvement of the old and well-known fabrics.

The specifications state in part: "In order to overcome the foregoing difficulties [in producing puffs sharp and accentuated and in retaining the puffs when the fabric is in use through shrinkage, wearing, tearing, etc.] confronting the user of the prior puffed fabrics, we have discovered the present invention. Our novel puffed fabrics possess sharp and accentuated puffs and the patterns produced by said puffs have a highly attractive three-dimensional appearance. Advantageously, the puffs of our fabrics are permanently retained so that the desired pattern design is preserved after a long period of use." Thus plaintiff's position in a nutshell is that the result of the Faris invention can be summed up as the production or the achievement of a puffed fabric having sharp and accentuated puffs which are truly permanent in and of themselves.

In studying the Faris patent we are studying a cloth, the nature of its weave, the threads from which it is made and the properties of those threads which cause the cloth to have a puffed form. The claims of the Faris patent are to a product and not to a method of weaving or puffing or making a cloth.

I make the following specific findings of fact and conclusions of law, the findings being numbered and the conclusions being lettered.

1. Faris and Koenig made the development here alleged as the invention of the Faris patent in the second quarter of 1947.

2. The development of Faris and Koenig was a puffed fabric having a body of saran filaments with polyethylene shrinker threads so that heat after weaving would cause a puff by reason of the relative difference in the shrinkage of polyethylene and saran, polyethylene having the greater shrinkage.

3. There is no substantial evidence that the industry or any part thereof had at the time of the development of Faris and Koenig any pronounced problem before it or had made any effort to solve any problem which had long defied it. Such proof as exists is limited to experiments of the patentees.

4. The puffed fabrics of Faris and Koenig did not meet any unsatisfied wants or create any immediate commercial interest despite plaintiff's efforts to create such interest.

5. The weave and general thread arrangement of the fabrics of Faris and Koenig was not original with them or new in 1947, but was a routine adaptation of known textile construction.

6. The use of shrinker threads or yarns floated across the back and across the face of the body of a fabric was old prior to 1947 and was a well-known device at the time Faris and Koenig made their alleged invention.

7. The use of shrinkers "floated predominantly" on the back of the main body and across the puffs (Claim 1) and having "at least 75% of their total length floated on the back of the main body of the fabric" (Claim 2), "said shrinkers intersect(ing) said main body to define borders of said puffs" (Claim 3) and having "short lengths" "floated over the face of the main body of the fabric" (Claim 4) was old prior to 1947 and prior to any alleged inventions made by Faris and Koenig. (See the puffed fabrics of Posselt, (Fig. 715, page 143, Item 24 of D–14), and Watson (Fig. Q, page 97, Item 23 of D–14) and D–88 and D–89, Lucien Forestier Corporation fabrics. The testimony of Goldberg (pages 1100–1101) establishes that the rayon shrinkers on D–88 and D–89 "float predominantly" on the back of the main body and across the puffs, and "at least 75%" of their total length on the back of the main body "intersect" the borders of the puffs and have "short lengths" which are floated over the main body of the fabric. The testimony of Meyer (page 865) shows that shrinkage in said rayon shrinkers was produced by the application of heat).

8. No weave or floater or cloth construction claimed in the Faris patent was new in 1947 or could be claimed as an invention of Faris and Koenig.

9. The concept of utilizing the differential shrinkage of yarns or filaments to produce puffed fabrics was old prior to 1947 and prior to the alleged invention of Faris and Koenig. (A witness for the plaintiff, Dr. Fox, at page 42, refers to "the classical theory of applying heat to thermoplastics.")

10. Any alleged invention reflected by the Faris patent must arise from the act of substitution of thermoplastic filaments in a known cloth construction.

11. Thermoplastic fibers were available to the textile industry prior to 1947. (Goldberg, page 1063.)

12. As the thermoplastic fibers appeared in a form suitable to the textile industry their properties became known to the textile manufacturers. (Goldberg, page 1066.)

13. In the textile industry the selection of the kind of fiber filament or thread to be employed in a given cloth depends upon the characteristics which it is desired to impart to the cloth. (Bethea, page 1049.)

14. The properties of a woven fabric are determined primarily by the properties of the fibers used in the weaving of the cloth.

15. Thermoplastic fibers had been used prior to 1947 in the weaving of fabrics the end use of which was automobile fabrics, among the fibers so used being saran and polyethylene and their properties for this use were well-known.

16. All of the properties of the fabrics of the Faris patent which are named in the patent are (a) the known properties of saran, (b) the known properties of the old weave used in cloth, or (c) the properties of the alleged invention of Nicholl, the person named as patentee in the Nicholl patent (one property is appearance which is due to puffing or color, puffing being an old characteristic in the industry and color being a well-known characteristic of saran. in

1942, see Item 25 of D–14; the two-toned effect as adding to appearance is merely a property of weave as can be seen in the pre-war non-thermoplastic cloths of Forestier, D–88 and D–89; "breathing qualities", if a property of the weave, is old and well-known and, if a property of puffing, is also old and well-known because puffed fabrics are not new; comfort is likewise a matter of the weave or puff; "heat setting" as a property of thermoplastics was a matter of common knowledge (Fox, pages 116 and 117); for the alleged permanency of the puffs the Faris patent relies largely upon the use of saran exclusively in both main body and shrinkers and as will be seen hereafter and, in fact, as is disclosed in the Faris patent, Column 3, lines 30–50, this is the invention of Nicholl and is the sole alleged improvement in the Nicholl patent over the Faris patent).

■ A. I conclude as a matter of law that the Faris patent is invalid by reason of the lack of invention.

In Jeoffroy Mfg., Inc., v. Graham, 5 Cir., 1953, 206 F.2d 772, 776, it was recognized that the Supreme Court, in Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 156, 71 S.Ct. 127, 129, 95 L.Ed. 162, 166, "has enunciated a more strict test of invention than existed theretofore." In the Great Atlantic & Pacific Tea Co. case, Mr. Justice Jackson, delivering the opinion for the Court, said:

"The concept of invention is inherently elusive when applied to combination of old elements. * * * "

" * * * 'The mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention.' * * * The conjunction or concert of known elements must contribute something; only when the whole in some way exceeds the sum of its parts is the accumulation of old devices patentable. Elements may, of course, especially in chemistry or electronics, take on some new quality or function from being brought into concert, but this is not a usual result of uniting elements old in mechanics * * *

"Neither court below has made any finding that old elements which made up this device perform any additional or different function in the combination than they perform out of it * * * Two and two have been added together, and still they make only four.

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is presented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added nothing to the total stock of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly.

" * * * But commercial success without invention will not make patentability * * * To bring these devices together and apply them to save the time of customer and checker was a good idea, but scores of progressive ideas in business are not patentable * * * ", and Mr. Justice Douglas, in a concurring opinion, said:

" * * * The Congress acts under the restraint imposed by the statement of purpose in Art. 1 § 8. The purpose is 'To promote the

Progress of Science and useful Arts'. * * *

" * * * The Framers plainly did not want those monopolies freely granted. The invention, to justify a patent, had to serve the ends of science—to push back the frontiers of chemistry, physics, and the like; to make a distinctive contribution to scientific knowledge. That is why through the years the opinions of the Court commonly have taken 'inventive genius' as the test. It is not enough that an article is new and useful. The Constitution never sanctioned the patenting of gadgets. Patents serve a higher end—the advancement of science. An invention need not be as startling as an atomic bomb to be patentable. But it has to be of such quality and distinction that masters of the scientific field in which it falls will recognize it as an advance * * *.

* * * * * *

" * * * The Patent Office, like most administrative agencies, has looked with favor on the opportunity which the exercise of discretion affords to expand its own jurisdiction. * * * "

In Smith v. Nichols, 1875, 21 Wall. 112, 118, 88 U.S. 112, 118, 22 L.Ed. 566, 567, the Supreme Court had under consideration a patent for improvements in woven fabrics and in holding the patent invalid, the Court, through Mr. Justice Swayne, said:

"The evidence before us leaves to the complainant none of the particulars claimed as of his invention, except, perhaps, greater tightness of the weaving, a firmer grasping of the elastic cords by the weft threads half round, above and below, and greater beauty and value of the fabric. The entire ground of the controversy between the parties is reduced to this narrow isthmus, and the question presented for our determination is one rather of law than of fact.

"A patentable invention is a mental result. It must be new and shown to be of practical utility. Everything within the domain of the conception belongs to him who conceived it. The machine, process or product is but its material reflex and embodiment. A new idea may be ingrafted upon an old invention, be distinct from the conception which preceded it, and be an improvement. In such case it is patentable. The prior patentee cannot use it without the consent of the improver, and the latter cannot use the original invention without the consent of the former. But a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent. These rules apply alike, whether what preceded was covered by a patent or rested only in public knowledge and use. In neither case can there be an invasion of such domain and an appropriation of anything found there. In one case everything belongs to the prior patentee; in the other to the public at large.

"The question before us must be considered in the light of these rules. All the particulars claimed by the complainant, if conceded to be his, are within the category of degree. Many textile fabrics, especially those of cotton and wool, are constantly improved. Sometimes the improvement is due to the skill of the workmen, and sometimes to the perfection of the machinery employed. The results are higher finish, greater beauty of surface, and increased commercial value. *A patent for the better fabric in such cases would, we apprehend, be unprecedented.* The patent in the present case rests upon no other or

better foundation." (Emphasis supplied.)

Faris and Koenig used or substituted thermoplastic filaments where others had used non-thermoplastics such as cotton, wool and rayon and have produced a puffed fabric somewhat different from puffed fabrics produced by others. The prior art has used softer materials, presumably because they wanted softer puffs for sofas and other type uses. The substitution of a harder, stiffer thermoplastic thread would naturally and expectedly produce a more stubborn, resistant, pronounced, sharper and more accentuated puff, but as the Supreme Court said in Smith v. Nichols, supra, "All the particulars claimed by a complainant, if conceded to be his, are within the category of degree. Many textile fabrics, especially those of cotton and wool, are constantly improved. Sometimes, the improvement is due to the skill of the workmen and sometimes to the perfection of the machinery employed. The results are higher finish, greater beauty of surface, and increased commercial value. A patent for the better fabric in such cases would, we apprehend, be unprecedented."

In the recent case of Little Mule Corporation v. Lug All Company, 5 Cir., 1958, 254 F.2d 268, Judge Rives, writing for the court holding a combination patent invalid for want of any new or beneficial result or any old result attained in a more facile, economical or efficient way, quoted with approval Justice Bradley's classic conclusion in Atlantic Works v. Brady, 1883, 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438, 441, as follows:

"The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufacturers. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith."

Notwithstanding the presumption of validity that usually attends the issuance of a patent, and the rule that in determining whether invention exists, Courts should guard against over-simplification through a hindsight view of the problem, and not doubting that the Faris fabric has achieved a different puff from the puffs made from softer threads or that it has enjoyed some commercial acceptance, nevertheless a study of its structure in the light of the prior art and the Foster patent, hereinafter mentioned impels the conclusion that the Faris patent merely reveals "a combination which only unites old elements with no change in their respective functions." Great Atlantic & Pacific Tea Co. v. Supermarket Equip. Corp., supra. See, also, Graham v. Jeoffroy Mfg., Inc., 5 Cir., 1953, 206 F.2d 769, 772.

Faris Patent Described in Printed Publication (35 U.S.C.A. § 102(b))

17. B. } With reference to the Faris patent, I find as a fact and also conclude as a matter of law that it was described in a printed publication more than one year prior to the date of application for said patent and in consequence said patent is invalid under the terms of 35 U.S.C.A. § 102(b).

The cited code section, as a condition of patentability, provides that a person

shall be entitled to a patent unless, *inter alia*, "(b) the invention was * * * described in a printed publication * * more than one year prior to the date of the application for patent * * *". As above stated, the date of application for the Faris patent was March 31, 1955. More than one year prior thereto, and on August 19, 1952, the Foster U. S. Patent No. 2,607,104 (Item 13, D–14) was issued and, consequently, as of the latter date became a printed publication.

I find as a fact and conclude as a matter of law that the Foster patent, particularly its Fig. 7, substantially and effectively discloses the claimed invention of the Faris patent. The Foster patent covers specifically a triple ply corrugated fabric, but discloses also that "the two-ply corrugated fabric of Fig. 7 is produced by employing a shrinkable fabric 21 that is similar to either fabric 10 or 11 above described, and by weaving it along the rows 22 to a much stiffer fabric 23 that is similar to the fabric 12." Column 5, lines 48–52. The Foster patent teaches that the fabric forming the corrugations or puffs in Fig. 7 is to be constructed of saran and the shrinkable factor in line 21 of Fig. 7 is to be polyethylene. Plaintiff claims that Fig. 7 of the Foster patent does not disclose the Faris invention because:

(1) It says the Foster patent teaches that the corrugated fabric 23 in Fig. 7 must not shrink. What the patent says on this point is "Since the stiff intermediate fabric 12 is not shrunken by this hot water treatment it will buckle to form the corrugations shown in Fig. 2 which corrugations are anchored to the top sheet 10 along the rows 16 and to the bottom sheet 11 along the rows 17". Column 5, lines 2 through 7. And in Column 4, lines 42 through 48, "The intermediate fabric 12 is preferably woven entirely of a relatively stiff and resilient, synthetic filament yarn such as saran * * * Saran does not shrink appreciably at temperatures below 212 degrees F." I think it would not be unfair to say that Foster was speaking in comparative terms and that "appreci-ably" may be implied in the former quotation where it was expressed in the latter.

(2) The saran corrugated material is not plasticized at the low temperature used by Foster. This, too, would seem to be a matter of degree. If it will not shrink "appreciably", it may not plasticize appreciably, but may plasticize to some extent.

(3) The polyethylene shrinkers do not intersect or engage the saran filaments. This is predicated upon plaintiff's contention that the warp yarns 22 of fabric 21 (running perpendicular to the paper in Fig. 7) are of ordinary cotton and are not thermoplastic, and that it is these cotton yarns 22 which are interwoven with the corrugated saran fabric 23, and that thus there is no thermoplastic shrinker yarn which engages or is interwoven with or is thermoplastically interlocked with any part of the main body 23, Fig. 7. It is true that Foster's specifications say in Column 3, lines 46–48 "The top and bottom fabrics *may be* formed *primarily* of ordinary cotton yarns, and all of the warp yarns of fabrics 10 and 11 *may be* the ordinary cotton warp yarns 13." (Emphasis supplied.) This, of course, does not prohibit the use of thermoplastics in lieu of cotton as warp yarns 22 of fabric 21, and

(4) Plaintiff says that the corrugated fabric 23 of Fig. 7 is made up only of a series of unidirectional threads or filaments rather than of ordinary fabric woven of threads run in both directions. This contention is not supported by the language of the Foster patent which constantly refers to this intermediate structure as a "fabric". One of the dictionary definitions of "fabric" is "cloth that is woven or knit from fibers, either vegetable or animal; as silks or other fabrics," also, "a woven material." Moreover, in Column 2, lines 28–33, we read "The intermediate fabric preferably is formed with an open weave that will permit air passing through one channel to pass laterally from one channel to another, so that if one channel

is blocked by being compressed the air can readily pass laterally to another channel." Then too, by looking at this intermediate fabric 12 in Fig. 2, which corresponds to the corrugated material 23 in Fig. 7, the loose or open weave above referred to is plainly discernible.

■ Thus it appears that the Foster patent as a printed publication measures up to the requirements "that in order for a prior publication * * * to invalidate a patent it must describe the invention so that any person skilled in the art can practice it without further instruction. O. K. Jelks & Son v. Tom Huston Peanut Company, 5 Cir., 52 F.2d 4." Maibohm v. RCA Victor Co., 4 Cir., 1937, 89 F.2d 317, 320.

### Patentability of Nicholl Invention

With reference to the Nicholl patent, I make the following specific findings of fact and conclusions of law.

18. When in late 1953 Nicholl made the alleged invention of the 2,757,436 patent, he merely replaced the polyethylene shrinker of the Faris and Koenig P–47 cloth with a high shrink saran filament.

Nicholl claims that his patent is for an improvement of the Faris patent. He feared that the original Faris cloth P–47 made in the second quarter of 1947 (Faris, pages 670–2) would be unsatisfactory in that the main body being made of saran and the shrinkers being made of polyethylene, the puffs would not hold their uniform shape in use because whereas both materials would shrink differentially upon the initial application of heat, the polyethylene shrinking more than the saran, the polyethylene has the disadvantage of shrinking, and shrinking, and shrinking. It shrinks up to 400% of its length and on each new application of heat in use it would continue to out-shrink the saran and thereby make the puffs too sharp and accentuated. The idea, therefore, was to substitute for the polyethylene shrinkers a material which would have high initial shrinkage just as the polyethylene had but would thereafter have only a moderate shrinkage like the regular saran used in the main body.

The claims of the Nicholl patent are:

"1. A woven thermoplastic fabric having puffs constituting an ornamental pattern therein comprising thermoplastic filaments and heat shrunken thermoplastic shrinker filaments, said puffs having been formed by the shrinking of said shrinker filaments, said heat shrunken shrinker filaments possessing substantially the same shrinkage characteristics as the first mentioned thermoplastic filaments, and having been heat shrunken from heat shrinkable filaments which prior to shrinkage possess a higher initial heat shrinkability than the first mentioned thermoplastic filaments whereby to form the puffs upon initial shrinkage of the heat shrunken filaments.

"2. A woven thermoplastic fabric in accordance with claim 1 wherein the first mentioned thermoplastic filaments and the heat shrunken thermoplastic filaments have substantially the same physical properties.

"3. A woven thermoplastic fabric having puffed portions constituting an ornamental pattern therein, said fabric comprising a main body presenting such puffed portions, and having warp and weft thermoplastic filaments of given heat shrinkability and heat shrunken thermoplastic filaments defining the puffed portions and maintaining their puffed configurations, said second mentioned thermoplastic filaments having substantially the same heat shrinkability as the first mentioned warp and weft thermoplastic filaments but which in the fabric prior to shrinkage have higher initial heat shrinkability than the warp and weft thermoplastic filaments whereby to form the puffed portions upon initial shrinkage of the second mentioned thermoplastic filaments

"4. A woven thermoplastic fabric having puffs constituting an ornamental pattern therein comprising thermoplastic filaments and heat shrunken thermoplastic shrinker filaments, said puffs having been formed by the shrinking of said shrinker filaments, the first mentioned thermoplastic filaments and the heat shrunken thermoplastic shrinker filaments being of a vinylidene chloride-vinyl chloride copolymer containing vinyl chloride in a minor amount, the amount of vinyl chloride being greater in said heat shrunken thermoplastic shrinker filaments that the first mentioned thermoplastic filaments.

"5. A woven thermoplastic fabric in accordance with claim 4 wherein the amount of vinyl chloride in the heat shrunken thermoplastic shrinker filaments is in the range of about 18 to 30% by weight of the copolymer and the amount of vinyl chloride in the first mentioned thermoplastic filaments is in the range of about 4 to 15% by weight of the copolymer.

"6. A woven thermoplastic fabric in accordance with claim 5 wherein the amount of vinyl chloride in the heat shrunken thermoplastic shrinker filaments is about 20% by weight of the copolymer and the amount of vinyl chloride in the first mentioned thermoplastic filaments is about 11% of the copolymer."

19. High shrink saran filaments were in existence and were known prior to the time Nicholl suggested the use of such a filament as a substitute for the polyethylene filament in the Faris and Koenig cloth.

20. Prior to the time late in 1953 when Nicholl suggested the use of a high shrink saran filament as a substitute for the polyethylene filament as a shrinker in the Faris and Koenig cloth the use of high shrink filaments as a substitute for polyethylene filaments was known to Dow Chemical Company, to Dawbarn Brothers, to United States Rubber Company and to defendant, and had been used by United States Rubber Company and by the defendant in the weaving of cloth which, after weaving, was to be puffed. (Dawbarn, pages 625-6; 629, D-34, D-35, D-36; Kennedy, pages 932-3; Cheney, pages 482, 501-2, D-23; Dawbarn, pages 635-40, D-37, D-38, D-39; Kennedy, pages 933-5, D-94, pages 935-40, D-96, D-97, D-98, D-99; Cheney, pages 499, 504-6; Kennedy, pages 941-4, D-11, D-101, D-102; Kennedy, pages 946-7, 952; Dawbarn, page 652; Cheney, page 499; Kennedy, pages 944-51; Swift, pages 719-21, D-45, D-46, pages 721-8, 739.)

21. Prior to late 1953, the date on which Nicholl suggested the use of high shrink saran as a substitute for polyethylene shrinkers, another employee of plaintiff, Edward White, had made a similar suggestion. (D-7, D-8, Samler, pages 291-6, 306; White, pages 580-3.)

22. The substitution of saran shrinkers for other shrinkers in the manufacture or puffing of puffed fabrics was done independently by others before plaintiff or any of its employees suggested or employed such substitution. (Meyer, pages 864-6, D-83; Dawbarn, page 629; Kennedy, page 932; Cheney, pages 482, 501-2, and Swift, pages 728-39.)

23. Nicholl did not develop or invent any particular kind of high shrink saran filament. He merely called plaintiff's supplier of saran, National Plastics Products Company, and ordered some saran with a shrinkage "pretty much as high as he could get." (Samler, page 268.)

24. In response to Nicholl's request for a high shrink saran, National Plastics developed a different formulation for plaintiff which plaintiff thereafter used in its cloths.

25. The substitution by Nicholl of a high shrink saran shrinker filament for the polyethylene filament in the cloth of the Faris patent did not produce a cloth having any different properties

than that to be expected from the known properties of the filaments of which the cloth was composed.

26. The concept of a homogenous or balanced cloth or of a cloth having the same composition or shrinkage throughout was not a new one when Nicholl, in 1953, decided to substitute for the polyethylene shrinker of the Faris cloth the known high shrink saran filament. (Fox, page 124; Kahil's Patent 2,401,-829, dated June 11, 1946, Item 10, D–14, Column 1, line 55 to Column 2, line 4; Goldberg, pages 1082–4, D–128.)

■ C. With reference to the Nicholl patent I conclude as a matter of law that it is invalid by reason of lack of invention.

27.
D. } I find as a fact and conclude as a matter of law that notwithstanding the statutory presumption of validity of the Faris and Nicholl patents arising from their grant the defendant has successfully carried the burden of establishing the invalidity of said patents.

### Abandonment as to Faris Patent

The defendant contends that Faris "abandoned the invention" and that, therefore, the Faris patent is invalid (35 U.S.C.A. § 102(c)). This contention is bottomed upon these facts. Faris was president of a corporation which was, in 1945, retained by plaintiff to develop fabrics. Nicholl, an employee of plaintiff, was charged with the responsibility of obtaining patents on any inventions developed by Faris and such inventions were to belong to plaintiff. The Faris cloth, P–47, was developed by Faris and his associate Koenig in 1947 and was then considered meritorious by Faris and Nicholl. Samples of this cloth were woven and sent to plaintiff's salesman Brown, who was instructed to exhibit it to the automotive trade. Brown showed it to the representative of the Chrysler company and the Packard company, but was not able to elicit sales interest. Nicholl still thought it was pretty good and Brown, thinking

that Detroit was not ready for the invention and that the fabric was ahead of the time, or ahead of the demand in Detroit, placed the cloth in his file to be reviewed from time to time. Nicholl states that the fabric was "put on the shelf" because of his "feeling that sometime there would be an interest in the thing." All of the above, except for the development of the cloth itself, was in 1948. Five years later, in 1953, Brown, in pursuance of his responsibility to develop further sales interest in the cloth, again showed it, this time to the Chrysler company and also to the Lincoln-Mercury Division of Ford and, from the latter, developed some "real keen interest." During this period from 1947 through 1953 no application for patent was made on the cloth by plaintiff or by Johnson and Johnson, of which plaintiff is a subsidiary, although during that period approximately 100 patent applications were filed by them, including several applications for patents relating to fabrics. Brown observed in Detroit some time after March 3, 1955, rolls of puffed fabric bearing the label of a competitor which had the construction of the cloth of the Faris patent, and he had seen the first such puffed fabric which had been sold by a competitor in November, 1954. As early as June 1, 1954, the plaintiff had learned of defendant's then recent entry into the manufacture of puffed fabrics like those plaintiff was then selling in Detroit. Nicholl explains the delay in applying for patent by saying that he had a supervisor who was always interested in and always requesting that they develop something and put it on the shelf, in effect, so that they could pull it down and manufacture and market it if some unusual time came when their other business began to fall off, and that, in effect, they would put this on the shelf feeling that sometime there would be an interest in it. He says also that he did not care to incur the expense of filing and prosecuting a patent application for something that would have no utilitarian value or no economic value.

28. I find that the cloth, sample of which is P–47, is within the claims of the Faris patent.

29. I find that the acts of plaintiff, Nicholl, Faris and Koenig over the years from 1947 to March 31, 1955 (the date of application for the Faris patent) do not show either an intent not to patent the cloth now the subject of the Faris patent, or any intent to delay patenting said cloth to thereby postpone the alleged monopoly to a time when its term would square with the period when the commercial profit from it would be highest.

E. I conclude as a matter of law that neither the plaintiff, Faris, Nicholl nor Koenig abandoned the alleged invention of the Faris patent.

█ Questions relevant to actual or to constructive abandonment of inventions are questions of fact and the law requires that every reasonable doubt relevant to any such question should be resolved in favor of the patent. Cleveland Trust Co. v. Schriber-Schroth Co., 6 Cir., 1937, 92 F.2d 330. As was said in Gear Grinding Mach. Co. v. Studebaker Corporation, 6 Cir., 1921, 270 F. 934, 936, and quoted approvingly in Cleveland Trust Co. v. Schriber-Schroth Co., supra, I find and conclude in the instant case that "abandonment depends upon intent, actual or imputed. The actual intent did not exist, and the circumstances do not require that the intent be by law imputed, as against the truth." See, also, Crown Cork & Seal Co. v. Aluminum Stopper Co., 4 Cir., 1901, 108 F. 845, 847, in which the facts are quite similar to those in the instant case and the delay was explained by a determination to "lay all the parts and tools * * * on the shelf until after awhile." See, also, J. E. Hanger, Inc., v. J. F. Rowley Co., 1924, 54 App.D.C. 336, 298 F. 359, 361; Virginia-Carolina Peanut Picker Co. v. Benthall Mach. Co., 4 Cir., 1916, 241 F. 89, 100 and International Tel. Mfg. Co. v. Kellogg Switch Board & Supply Co., 7 Cir., 1909, 171 F. 651, 656.

For its contention of abandonment, defendant relies principally upon Woodbridge v. United States, 1923, 263 U.S. 50, 44 S.Ct. 45, 68 L.Ed. 159 and Macbeth-Evans Glass Co. v. General Electric Co., 6 Cir., 1917, 246 F. 695, which cases do not require, even if they would authorize, a finding of abandonment. These two cases in the first place are not abandonment cases. In the Woodbridge case, the Court said, 263 U.S. on page 56, 44 S.Ct. on page 47: "This is not a case of abandonment. It is a case of forfeiting the right to a patent by designed delay * * *", and in the same case the Court, in referring to the Macbeth-Evans Glass Company case, said, 263 U.S. on page 59, 44 S.Ct. on page 48: "The case which comes nearer in its facts to this than any other, and is a case of forfeiture rather than abandonment is that of Macbeth-Evans Glass Co. v. General Electric Co. * * *".

█ The defendant does not contend here that there was a forfeiture. Forfeiture may result where (a) an inventor practices his invention in secret and for profit and later when his secret is in danger of becoming disclosed seeks to increase his period of enjoying his monopoly by obtaining a patent, Macbeth-Evans Glass Co. v. General Electric Co., supra; Kendall v. Windsor, 21 How. 322, 62 U.S. 322, 16 L.Ed. 165; Pennock and Sellers v. Dialogue, 2 Pet. 1, 27 U.S. 1, 7 L.Ed. 327; Allison Mfg. Co. v. Ideal Filter Co., 8 Cir., 1927, 21 F.2d 22, or (b) in cases where others have enriched the art by their own endeavors acting independently of the inventor. Woodbridge v. United States, supra; Woodbury Patent Planing-Machine Co. v. Keith, 1880, 101 U.S. 479, 25 L.Ed. 939; Shaw v. Cooper, 7 Pet. 292, 32 U.S. 292, 8 L.Ed. 689 and International Tel. Mfg. Co. v. Kellogg Switch Board & Supply Co., supra, 171 F. at page 656. It would have availed defendant nothing to plead a forfeiture in this case because the facts here would not support such a contention.

### In Public Use as to Plaintiff's Activities

The defendant contends that the Faris patent and the Nicholl patent are invalid

because the alleged inventions were "in public use" and "on sale" in this country more than one year prior to the date of the application for patents. 35 U.S. C.A. § 102(b).

As to the Faris patent, the "in public use" and "on sale" contentions are based upon the activities of plaintiff in showing the cloth P-47 to the designer, Prance, in Detroit in 1948 and in showing it to the styling sections of Chrysler Corporation and Lincoln-Mercury Division of Ford Motor Company in the autumn of 1953. As to the Faris patent and the Nicholl patent, said "in public use" and "on sale" contentions are based upon the activities of plaintiff in showing said cloth to the Lincoln-Mercury Division of Ford in February, 1954 (after Nicholl had substituted the saran shrinker for the polyethylene shrinker) which showing resulted in sample orders from Lincoln-Mercury Division on March 4, 1954, and March 12, 1954 and in written assurances from Lincoln-Mercury Division on March 10, 1954 that the cloth would be used in the 1955 Mercury Custom Station Wagon.

As to the Faris patent, the "in public use" contention and the "on sale" contention are based also upon the Lucien Forestier Corporation's cloth D-80 and D-85 (different samples of the same cloth) and upon the Albert J. Bartson, Inc.'s cloth D-71.

The detailed facts upon which the foregoing contentions are based may be summarized as follows. The cloth P-47 was developed by plaintiff in 1947. It was then woven in a two-yard quantity by plaintiff and after weaving was heated to shrink the polyethylene shrinkers and develop the puffs. Thereafter, in accordance with plaintiff's regular business custom, a custom prevalent in the entire textile industry in selling fabrics to automobile concerns, a piece of the cloth was sent to Brown, plaintiff's Detroit salesman. The reason for sending the sample was, if possible, to secure an order for more of the cloth which plaintiff would then fill. Brown showed the cloth in 1948 to the designer Prance of Briggs Manufacturing Company, which company did some styling work for some of the Chrysler Divisions and for Packard Motor Company. Brown was then trying to generate interest in the sample and in goods to be made in accordance therewith. Prance reported to Brown that there was no interest in the cloth on the part of his clients and returned the sample to Brown who then filed the sample in chronological order in his files so that he might review it from time to time in order to see what would fit in with whatever were the current styling ideas in the Detroit market. In the autumn of 1953, Brown showed the cloth to the styling section of the Chrysler Corporation and the styling section of the Lincoln-Mercury Division and the latter expressed some real keen interest in it. While Brown did not offer to sell the little sample to Prance in 1948, he would have sold it to him if Prance had indicated a willingness to buy and he would, of course, have also sold yardage goods corresponding to the sample. After interest in the sample was expressed by Lincoln-Mercury Division in the autumn of 1953, Nicholl became fearful that the polyethylene shrinker would prove unsatisfactory in that upon re-application of heat it would continue to shrink out of proportion to further shrinkage of the main body of the fabric and, therefore, in early 1954 he replaced the polyethylene shrinker with the high shrink saran shrinker and then the cloth so produced was used to interest the Lincoln-Mercury Division. The samples of this cloth having the saran shrinker were shown to the Lincoln-Mercury Division in February, 1954 through Brown and as a result plaintiff received a sample order on March 4, 1954. Also, on March 10, 1954, plaintiff received written assurances from the Lincoln-Mercury Division that the cloth would be used in the 1955 Mercury Custom Station Wagon and on March 12, 1954 plaintiff received another sample order. These were engineering purpose orders and called for puffed fabrics in test sample amounts

of 30 yards in each of four styles and 25 yards in each of three styles. (D–16 and D–17.) No goods were completed or shipped upon any order by Lincoln-Mercury prior to April 2, 1954. The plaintiff marked one of its invoices covering said shipments "Exptl Purpose" (P–50) by which marking plaintiff meant that said goods were shipped for experimental purposes. The fabrics shipped on April 2, 1954 were shipped within less than 24 hours after being made and were not paid for until 90 days later. These fabrics thus delivered to Ford Motor Company after April 2, 1954 were not entirely acceptable and had to undergo certain changes as to color or alterations. After Lincoln-Mercury became interested in the cloth it asked that plaintiff hold it on a confidential basis and it was not disclosed even to other automotive divisions of the Ford Motor Company until May of 1954 when Mr. Hobbs of the Ford Division called Brown for the purpose of seeing samples of this new fabric. Brown told Hobbs that this was a confidential matter for Lincoln-Mercury and that he could not disclose it without prior consent of Lincoln-Mercury. Lincoln-Mercury then consented on condition that Brown would disclose different patterns than that shown to Lincoln-Mercury.

30. F. } I find as a fact and conclude as a matter of law that neither the Faris alleged invention nor the Nicholl alleged invention was "in public use" in this country more than one year prior to March 31, 1955, the patent application date.

While the facts on this particular issue are without substantial dispute we should nevertheless approach the question in the light of the rule that prior public use must be proved beyond a reasonable doubt. Zachos v. Sherwin-Williams Co., 5 Cir., 1949, 177 F.2d 762, 763. See, also, Coffin v. Ogden, 1874, 18 Wall. 120, 124, 85 U.S. 120, 124, 21 L.Ed. 821, 823. While a single use for profit, not purposely hidden, may suffice

as a prior business use a mere experimental use will not. "The ordinary use of a machine or the practice of a process in a factory in the usual course of producing articles for commercial purposes is a public use." Electric Storage Battery Co. v. Shimadzu, 1939, 307 U.S. 5, 20, 613, 616, 59 S.Ct. 675, 684, 83 L.Ed. 1071, 1081.

"In Pitts v. Hall [19 Fed.Cas. page 754, No. 11,192], 2 Blatchf. [229] 235, Mr. Justice Nelson said: 'The patentee may forfeit his right to the invention if he constructs it and vends it to others to use, or if he uses it publicly himself in the ordinary way of a public use of a machine at any time prior to two years before he makes his application for a patent. That is, he is not allowed to derive any benefit from the sale or the use of his machine, without forfeiting his right, except within two years prior to the time he makes his application.' See, also, Am[erican] Hide & L[eather Splitting & Dressing Mach.] Co. v. Am[erican] Tool [& Mach.] Co., [1 Fed.Cas. page 647, No. 302] 4 Fish. [Pat.Cas. 284], 291; McMillin v. Barclay [16 Fed. Cas. page 302, No. 8,902] 5 Fish. [Pat.Cas.], 189; McClurg v. Kingsland, 1 How. 202 [11 L.Ed. 102]; Agawam [Woolen] Co. v. Jordan, 7 Wall. 583, 19 L.Ed. 177. The result must always depend upon the purpose and incidents accompanying the act or acts relied upon." Consolidated Fruit-Jar Co. v. Wright, 1877, 94 U.S. 92, 24 L.Ed. 68, 69.

" 'The question of fact, in this part of the case, must turn upon the character of the use of the lamp prior to September 16th, because it is established that the Hayes clamp and the Brush clamp, in its patented features, were substantially alike, and that the point in which they differ, viz., the length of the arms, is not a part of the principle of the device. Was the lamp with this clutch used merely to gratify curios-

ity, or for purposes of experiment, to see whether the feeding device was successful, or whether anything more was to be done to perfect it? Or was it put to use in the ordinary business of the mill, as a thing which was completed, and was for use, and was neither upon trial nor for show?

" '* * * The lamp was used at different times, in the work of the mill,. at night, in doors and out of doors. Its use at these times does not seem to have been for the purpose of testing the machine, or of calling attention to its qualities, or of gratifying curiosity, but it was used to furnish light to the workmen at their work. * * *'" Brush v. Condit, 1889, 132 U.S. 39, 47, 10 S.Ct. 1, 4, 33 L.Ed. 251, 255.

Thus it will be seen that the use contemplated by the statute is the ordinary business use for which the invention was designed. Other cases so declaring are Allison Mfg. Co. v. Ideal Filter Co., 8 Cir., 1927, 21 F.2d 22, 27; Daniel Green Felt Shoe Co. v. Dolgeville Felt Shoe Co., D.C.N.Y.1913, 205 F. 745, 752; Victor Talking Mach. Co. v. American Graph Co., D.C.N.Y.1905, 140 F. 860, 864.

Formerly it was required that to be patentable an invention must not have been known or used before the application but such is not now the law. "It is not a public knowledge of his invention that precludes the inventor from obtaining a patent for it, but a public use or sale of it." Elizabeth v. American Nicholson Pavement Co., 97 U.S. 126, 136, 24 L.Ed. 1000, 1005. "The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a [public] use." Idem, 97 U.S. at page 134.

Thus at all times more than one year prior to the date of the application for the Faris and Nicholl patents, March 31, 1955, while plaintiff endeavored to get its alleged inventions in public use

through lack of acceptance on the part of the public it failed in such efforts. The ordinary public use for which this fabric was designed was not simply exhibition by a salesman but its intended use was as seat cover materials for automobiles and heavy furniture.

### In Public Use and on Sale as to Forestier and Bartson Cloths

The last mentioned finding of fact and conclusion of law are not altered by defendant's contentions that the cloths of Lucien Forestier Corporation (D–80 and D–85) and Albert J. Bartson, Inc. (D–71) may be relied upon to establish the prior "public use" and "on sale" status of the Faris invention.

31. I find as a fact that the use in the year 1952 by the Lucien Forestier Corporation of the cloth D–80 and D–85 was a use for profit publicly made more than one year prior to the filing date of the application for the Faris patent; and that said cloth was on sale and sold in 1952 more than one year prior to the application date of the Faris patent.

32. I find as a fact that the Lucien Forestier Corporation's cloth D–80 and D–85 is a cloth which would be in all material respects within the terms of the claims of the Faris patent except only that the Forestier cloth does not come within the requirement of claim 1 of the Faris patent that its main body shall consist of "interwoven thermoplastic warp and weft filaments" in that the filling in the Forestier cloth is cotton, a non-thermoplastic.

33. I find as a fact that the use in 1953 by Albert J. Bartson, Inc. of its cloth D–71 was a use for profit publicly made more than one year prior to the filing date of the application for the Faris patent; and that said cloth was on sale and sold in 1953 more than one year prior to the application date of the Faris patent.

34. I find as a fact that the Albert J. Bartson, Inc.'s cloth D–71 is a cloth which would be in all material respects within the terms of the claims of the Faris patent except only for two dif-

ferences, namely, (1) the Bartson cloth D–71 fails to come within the terms of claim 1 of the Faris patent which requires that its main body shall consist of "interwoven thermoplastic warp and weft filaments" in that the Bartson cloth in its main body (as distinguished from its floaters or shrinkers) is made up of a cotton (non-thermoplastic) weft, and (2) the Bartson cloth fails to comply with the requirement of claim 2 of the Faris patent that "at least about 75% of the total lengths of said heat shrunk filaments are floated on the back of the main body" in that in the Bartson cloth these filaments are sometimes floated as much as 77% of their length and in other instances less than 75% of their length. (Goldberg, pages 1110–1111.)

G. I conclude as a matter of law that the on sale status of the Forestier and Bartson cloths did not, and does not, give rise to an "on sale" status for the alleged Faris invention.

The law requires that the "public use" and being "on sale" which invalidates an invention under 35 U.S.C.A. § 102(b) as constituting a complete anticipation of the invention must be a "public use" or "on sale" status of "the very invention patented." Goodwin v. Borg-Warner Corporation, 6 Cir., 1946, 157 F.2d 267, 272.

> "The defense of anticipation rests heavily upon the defendant. It is settled that as respects an unpatented device, claimed to be a complete anticipation of a patent in suit and depending as to its existence and use upon oral testimony, the proof must be clear, satisfactory, and beyond reasonable doubt." Twentieth Century Machinery Co. v. Loew Mfg. Co., 6 Cir., 1917, 243 F. 373, 379.

Where reliance is had upon an alleged "public use" or "on sale" of the invention under Section 102(b) "the primary inquiry is one of identity between two things." Stitt v. Eastern R. Co., D.C. Mass.1884, 22 F. 649, 651. Indeed, the language of 35 U.S.C.A. § 103 refers to Section 102 as requiring that the invention be "identically disclosed." While obviously the Forestier cloth D–80 and D–85 and the Bartson cloth D–71 are very similar to the alleged Faris and Nicholl inventions, so similar in fact that as this Court sees it any person having ordinary skill in the art of textile fabrics and a working knowledge of thermoplastics with the Forestier and Bartson cloths before him would have no difficulty in constructing the Faris cloth P–47 and modifying it as Nicholl did, and the subject matter as a whole would have been obvious to such person, this Court is of the opinion that these cloths cannot be said to be identical and that the differences above enumerated require a holding against the defendant's contention that the alleged Faris patent is invalid solely because of prior "public use" or "on sale" status of the Forestier and Bartson cloths.

On Sale as to Plaintiff's Activities

35. I find as a fact that at all times here material it was the custom of the textile industry to solicit trade from the automobile manufacturers in Detroit by exhibiting samples of the cloths for which orders are sought.

36. I find as a fact that when the textile industry solicits trade from the automobile manufacturers in Detroit the goods for which orders are sought are in being in the sense of the existence of a sample which is shown and offered but are not then present in bulk or yardage quantities on the shelves of the textile company, it being the custom of the industry to delay weaving of bulk quantities until the order is obtained.

37. I find as a fact that the textile industry does not commonly place goods on sale to the automobile manufacturers in Detroit in any other manner than that stated in the two immediate preceding findings of fact.

H. I conclude as a matter of law that the Faris patent is invalid because of plaintiff's acts in placing the cloth of the patent on sale in Detroit in 1948 and 1953 more than one year prior to the date of application for said patent.

324

I. I conclude as matter of law that the Faris patent and the Nicholl patent are each invalid because of plaintiff's action in placing cloth of each of said patents on sale in Detroit in February and March, 1954 and more than one year prior to the date of application for each of said patents.

 The statutory language is "on sale", not "sold". Accordingly, an actual sale is not necessary.

"The offer to sell the wagon jack more than two years [now one year] before filing application is enough. Actual sale is not necessary. Plimpton v. Winslow, C.C., 14 F. 919; Henry v. Soapstone Co., C.C., 2 F. 78." Covert v. Covert, C.C.W.D. N.Y.1901, 106 F. 183, 188.

"It is true these pouches were not made up in advance and carried in stock, for the custom of the trade was to sell all such pouches by sample, as the printing and advertising on the pouch must be done after the order has been received.

"Mr. Walker, in his works on Patents ([11th Ed.] page 96), lays down the rule:

" 'Indeed, a device will be on sale within the meaning of the law, if it is offered for sale, whether any specimen of it is actually sold or not.' The same is true as to public use. Egbert v. Lippman, 104 U.S. 333–336, 26 L.Ed. 755.

"It is apparent, therefore, that the pouch in question was as much 'on sale' as any other pocket sold by defendant. The theory of the brief presented by Parmenter was that an article could not be said to be on sale until it was in esse, and the filling an order, and being ready to fill all orders for such pouches, did not bring the case within the provision of section 4886, Rev.St. (U.S.Comp. St.1901, p. 3382). Authorities were cited which, by reason of the distinguishing features, do not reach the principle of the instant case. It is unnecessary to discuss them in de-

tail. To say that these goods were not on sale would be juggling with words that are plain. National Cash Register Co. v. American Cash Register Co., 2 Cir., 178 F. [79] 80.

"I am satisfied from the evidence that the cigar pouches in question were on sale, and that large quantities of the same were actually sold before the date in question; and this conclusion is fatal to both patents in suit." Dittgen v. Racine Paper Goods Co., C.C.E.D.Wis.1910, 181 F. 394, 398.

"The statute does not require a 'sale,' but only a placing 'on sale,' prior to two years [now one year] before the application. Under this language a completed sale, either with or without delivery, is not demanded; an offer to sell, made to a prospective purchaser after the experimental stage has been passed, the invention reduced to practice, and the apparatus manufactured in its perfected form, is a placing on sale within the statute. Covert v. Covert, C.C., 106 F. 183; Dittgen v. Racine Paper Goods Co., C.C., 181 F. 394. We do not share the doubt expressed on this point in McCreery Engineering Co. v. Massachusetts Fan Co., 1 Cir., 195 F. 498, 502, 115 C.C.A. 408." Wende v. Horine, 7 Cir., 1915, 225 F. 501, 505.

"The facts are within our decision in Wende v. Horine, 7 Cir., 225 F. 501, 505, where we said: 'The statute does not require a "sale," but only a placing "on sale," prior to two years [now one year] before the application. Under this language a completed sale, either with or without delivery is not demanded; an offer to sell, made to a prospective purchaser after the experimental stage has been passed, the invention reduced to practice, and the apparatus manufactured in its perfected form, is placing on sale within the statute.' " Magee v. Coca-Cola Company, 7 Cir., 1956, 232 F.2d 596, 600.

See, also, Maibohm v. RCA Victor Co., 4 Cir., 1937, 89 F.2d 317, 321.

For its contention that its conduct did not constitute placing its alleged inventions on sale, the plaintiff relies primarily upon the following cases. Baker-Cammack Hosiery Mills v. Davis Co., 4 Cir., 1950, 181 F.2d 550; B. F. Sturtevant Co. v. Massachusetts Hair & Felt Co., 1 Cir., 1941, 124 F.2d 95; Burke Electric Co. v. Independent Pneumatic Tool Co., 2 Cir., 1916, 232 F. 145, affirmed 234 F. 93; Hutten v. Frank Krementz Co., 3 Cir., 1916, 231 F. 973; Daniel Green Felt Shoe Co. v. Dolgeville Felt Shoe Co., D.C.N.D.N.Y.1913, 205 F. 745; McCreery Engineering Co. v. Massachusetts Fan Co., 1 Cir., 1912, 195 F. 498 and Connecticut Paper Products v. New York Paper Co., D.C.Md. 1941, 39 F.Supp. 127.

It is believed that the facts of the above cited cases are so different from the facts of the instant case that they do not militate against the last two conclusions of law above announced. For instance, in the McCreery case the Court was dealing with private drawings or plans which had never been put into physical form and with an agreement which merely contemplated a future production from such plans. In the B. F. Sturtevant Company case following McCreery it is pointed out that "it does not appear when the fan * * * was manufactured or delivered, or when it went into use." [124 F.2d 97.] Officials of the Sturtevant Company had "explained their device" to the consulting engineer of a prospective purchaser and the latter listed the fan as "purchased" by it. In Burke Electric Company, the patent application was filed September 9, 1909 making the crucial date September 9, 1907. On June 27, 1907, Barker had written to Burke, the inventor, asking about getting some of the motors. Burke had previously written Barker that work on the modified sample had been pushed along and that the first motor would be sent on the 15th for Barker's approval. Judge Learned Hand, then District Judge, after observing that "No sample motor had reached Barker by July 23d and we have every reason to suppose that the 'modified sample,' when actually sent, was motor No. 1 shipped with another on September 26, 1907", appraised the evidence as follows: "The situation for the defendant at best is then only this: Before September 9, 1907 Barker and Burke had concluded an agreement to buy and sell 100 motors, subject to Barker's approval of the kind to be delivered." [232 F. 146.] In Daniel Green Felt Shoe Company, the significant sentence is [205 F. 752]: "The patent in suit, was applied for July 1, 1907, and going back two years to July 1, 1905, we have no sample or samples of this shoe *made* or made and sold prior to that time." (Emphasis supplied.) In the Hutten case the sample eyeglasses were, with one Meyrowitz, "left to show". [231 F. 974.] The District Court pointed out that "they were not sold to Meyrowitz, nor left with him to sell for Geoffroy & Co., nor were they offered to him for sale * * * and there is nothing to show that they were left with Meyrowitz to buy if he approved of them. He did not subsequently buy them but returned them." In Baker-Cammack Hosiery Mills there was no offering of the sample except to the patentee's own sales representative, and in Connecticut Paper Products the negotiations centered around "an imperfect model." [39 F. Supp. 133.]

This Court recognizes the force of plaintiff's argument that there is a valid basis for holding "on sale" to embrace only that conduct which "creates an opportunity for present public use", as held in Burke Electric Co. v. Independent Pneumatic Tool Co., supra, but is of the opinion that in the instant case plaintiff's conduct created just such an opportunity. The cloth represented by P–47 was completed in 1947. The plaintiff was satisfied with it and solicited orders with the then present ability and desire to fill the same. The plaintiff had no thought of changing that cloth until as late as the autumn of 1953, when Nicholl conceived the idea of substituting saran floater

shrinkers for polyethylene floater shrinkers. This change was achieved in early 1954 and when in February and March, 1954 the Nicholl fabric was placed on sale in Detroit the plaintiff was satisfied with it and had the then present ability and desire to fill orders therefor. Also, the use for which the fabric was offered, ordered, and later delivered, was a non-experimental use. Monroe v. Bresee, 7 Cir., 1917, 239 F. 727, 728.

### Infringement of Faris and Nicholl Patents

38. I find as a fact that if the Faris and the Nicholl patents were valid, the defendant's cloths, as represented by P–11 through P–23, both inclusive, would infringe each and every claim of each of said patents. While there may be minor differences here and there, such differences, this Court is constrained to hold, are too slight to be recognized as real distinctions. Graver Tank & Mfg. Co. v. Linde Air Prod. Co., 1949, 339 U.S. 605, 607–10, 70 S.Ct. 854, 94 L.Ed. 1097, 1101–1103; Connecticut Paper Products v. New York Paper Co., D.C.Md.1941, 39 F.Supp. 127, 134.

### The Design Patents

39.
J. } I find as a fact and conclude as a matter of law that both of the design patents, Des. 178,456 and Des. 178,462 are invalid for lack of invention.

Des. 178,456 comprises a fabric having a plurality of horizontally spaced solidly colored puffed strips or channels alternating with intermediate strips of a contrasting color wherein there are vertically alternating rows of long hexagonal and diamond shaped puffs, the individual puffs of which are outlined by spaced thread portions which in turn contrast in color with the intermediate strips. The surface of the hexagonal puffs is woven with a pronounced twill extending in one direction of the fabric while the surface of the contiguous diamond shaped puffs is woven with a twill extending in the opposite direction. This provides contrasting shadow lines in the adjacent hexagonal and diamond shaped puffs.

Des. 178,462 comprises a plurality of diamond shaped starlike devices uniformly spaced on a field of solid color having a high gloss or sheen. Between the devices the field is puffed or raised in opposed serpentine ridges with the field underlying and connecting the devices forming valleys between the puffs. The valleys themselves consist of spaced wider vales directly underlying the devices and narrower connecting passes between the vales. The starlike devices are formed by three light parallel threads extending vertically in Fig. 1, the center one of which is considerably longer than the two outer threads, each of these vertical threads being made from a shiny, metallic material. The vertical threads are held in place against the field by light horizontal or cross-threads of a contrasting dull white finish, the two outer threads having one cross-thread each and inner longer thread having three cross-threads. Thus, a starlike device is formed by the crossing vertical and horizontal threads which has the appearance of containing five crosses, one in the center, one above and one below the center and one each side of the center.

As prior art against Des. 178,456, the defendant cites Des. 14,002, issued to Conde on June 26, 1883, D–130, Item 5, the Morgan fabric, D–130, Item 6 and a page from Sears-Roebuck catalogue showing ladies' girdles, D–130, Item 7. As prior art against Des. 178,462, the defendant cites four old design patents, D–130, Items 1, 2, 3 and 4, an illustration in a trade magazine D–130, Item 8 and a modification of plaintiff's prior design patent 176,222, D–131.

This prior art discloses designs strikingly similar to the two designs in suit. Des. patent 178,456 in suit consists of a dark stripe alongside a wider light stripe of different color overlaid with diamond and hexagonal figures, this pattern unit being repeated over the fabric. No mention of color is made in the patent and the law of design patents does not recognize invention in color. In re Cohn, 1935, 80 F.2d 65, 66–67, 23 C.C.P.A., Patents, 766. D–130, Items 5, 6 and 7 above re-

ferred to shows substantially identical stripes and diamond figure combinations.

Des. patent 178,462 in suit has as its motif a long central line flanked by two spaced apart shorter parallel lines, the long line having short horizontal crossovers proximate its ends and the shorter lines having crossovers centrally thereof. D–130, Item 1, shows this motif in its upper right and lower left hand corners. D–130, Item 2, shows this motif complete with horizontal crossovers at the middle of the shorter spaced parallel lines. D–130, Item 3, shows the motif, as does Item 4, in the border area surrounding the floral design. Moreover, this exact unit pattern is disclosed in plaintiff's earlier granted design patent, Des. 176,222, granted on November 29, 1955, revealed through the openings of the masking sheet forming part of D–131.

The plaintiff emphasizes that both of the design patents in suit show that they are for puffed or three dimensional fabrics, but so is its design patent, Des. 176,222, above mentioned. Furthermore, the adaptation or transfer of old designs or design elements from one type of surface to another is not patentable. See Jas. H. Matthews & Co. v. Bronze, 7 Cir., 1941, 124 F.2d 770, 771, and Eclipse Mfg. Co. v. Holland, C.C.N. D.N.Y.1894, 62 F. 465, 468.

As was stated in Sel-O-Rak Corp. v. Henry Hanger & Display Fix. Corp., 5 Cir., 1956, 232 F.2d 176, 177, " * * * [U]nder the statute providing for design patents there must be invention, newness, originality and ornamental qualities." Thus, a design, in order to be patentable, must not only be new, original and ornamental, but it must result from the exercise of the inventive faculty as well, and the fourth element, exercise of the inventive faculty, is the ultimate determinant of patentability. See Application of Jabour, 1950, 182 F.2d 213, 215, 37 C.C.P.A., Patents, 1084.

This Court does not think that either of plaintiff's design patents rises to the dignity of invention and is convinced that they are the result of the natural aptitude of skilled artisans as contrasted with inventive skill. Sel-O-Rak Corp. v. Henry Hanger & Display Fix. Corp., supra.

In the design patent case of H. W. Gossard Co. v. Neatform Co., D.C.S.D.N.Y. 1956, 143 F.Supp. 139, 143, affirmed 2 Cir., 240 F.2d 948, it was said:

"Not every new idea in decorating can be considered an 'invention'. Each merchandising season produces, in the field of women's garments, new and varied designs. In fact, it has been said that to invent anything in the way of a new dress design, however temporarily attractive such design may be, becomes almost impossible when one considers the enormous amount of fashion advertising, design service, magazines, and the host of skillful and intelligent dressmakers. White v. Lombardy Dresses, D.C.S.D.N.Y.1941, 40 F.Supp. 216. It may be that it is for reasons similar to this that there has not been a design patent upheld by the Court of Appeals in the Second Circuit subsequent to 1926. See Walker, Patents (Deller ed. 1937), 1955 Supplement §§ 134, 135.

"To sustain a patent for every slight change in decorative design would create a series of little monopolies in the decorating field which would hamper rather than help the development of the arts. Such is not the intent of the Patent law."

40. I find as a fact that if design patent 178,462 were valid it has been infringed by the defendant. In fact, the defendant so admits.

41. I find as a fact that if design patent 178,456 were valid it has not been infringed by the defendant.

Design patent 178,456 was not issued until August 7, 1956. The only manufacture of fabric under said patent by the defendant was completed prior to the issuance of the patent and the only sale made by defendant of such fabric was the sale made to S. E. Hyman Com-

**328**

pany, which sale was concluded on July 19, 1956, on which date the defendant received payment in full. While it is true that the defendant as bailee for the purchaser held some of said sold goods on storage for the purchaser, shipping the same to the purchaser after the issuance of the patent, such storing and shipping did not constitute a direct infringement on the part of the defendant, nor did it constitute an active inducement of infringement by the defendant because the evidence fails to show any actual infringement by the purchaser, S. E. Hyman Company, or by anyone else, in that there is no showing that any such person made, used or sold the patented invention after the issuance of the patent. Before one can be liable for actively inducing an infringement there must be an infringement. Cincinnati Galvanizing Co. v. Marquette Tool & Mfg. Co., 7 Cir., 1928, 26 F.2d 593. See, also, Jones v. Radio Corporation of America, D.C.S.D.N.Y.1955, 131 F.Supp. 82 and Conmar Products Corporation v. Tibony, D.C.E.D.N.Y.1945, 63 F.Supp. 372.

Let counsel for the defendant prepare a judgment in accordance herewith, submitting same to counsel for plaintiff who shall have 15 days after receipt of same for suggestions as to form.